**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____
                                        :
UNITED STATES OF AMERICA       :
                                        :      Civil Action No.: 08-0678(FLW)
                  Plaintiff,            :
                                        :            **Opinion**
       v.                               :
                                        :
EDWARD J. MOSBERG,             :
                                        :
                  Defendant.            :
_____:

**WOLFSON**, **United States District Judge**:

        Presently before the Court is a Motion by Defendant Edward J. Mosberg ("Defendant" or "Mosberg") to dismiss the Second Superseding Indictment ("Indictment") pursuant to <u>Fed. R. Crim. Pro.</u> 12(b)(3).  Mosberg, a real estate developer, is charged with the following counts, in connection with his alleged relationship with the former attorney for the Planning Board who, at times, acted as Township Attorney for Parsippany-Troy Hills ("the Attorney" or "Montefusco"): (a) conspiracy to commit honest services fraud in violation of 18 U.S.C. § 1349 (Count 1); (b) honest services fraud in violation of 18 U.S.C. §§ 1341 and 1346 (Counts 2-7); and bribery in violation of 18 U.S.C. § 666(a)(2) (Counts 8-11).  Mosberg is, further, charged with aiding and abetting in Counts 2-11, in violation of 18 U.S.C. § 2.

        Mosberg challenges each count of the Indictment as insufficiently plead.  He, further, brings statutory and constitutional challenges to the conspiracy and honest

services fraud statutes or counts.  Finally, Mosberg asks the Court to conduct an <u>in camera</u> review of the grand jury proceedings that resulted in the instant Indictment.

After thoroughly considering the parties' initial briefing, holding oral argument, and directing the parties to submit supplemental briefing, the Court denies Defendant's motion to dismiss as to all counts, with the exception of the aiding and abetting charges linked to Counts 8-11.  I, further, deny Mosberg's request for <u>in camera</u> review of the grand jury proceedings.  The reasoning underlying my decision follows.

## I.    BACKGROUND

### A.    The Alleged Scheme to Defraud

The Indictment alleges that Mosberg engaged in a several-year long bribery-based honest services fraud scheme, and conspiracy to defraud, with Montefusco, the Attorney for the Parsippany-Troy Hills Planning Board ("Planning Board" or "the Board") and, at times, attorney for Parsippany-Troy Hills Township ("the Township"). As a commercial and residential real estate developer, Mosberg oversaw his development entities' business involvement with the Township, including efforts to obtain various development approvals and resolutions from the Planning Board.[1] Count 1, ¶¶ 1a, 1d.  Mosberg was also involved in various legal disputes with the Township.  <u>Id.</u> at ¶ 1d.  These disputes revolved around several different matters,

---

[1] Mosberg is alleged to have owned and operated several development properties that were organized as either limited liability companies or corporations.  Count 1, ¶ 1a.  In referring to Mosberg, this opinion incorporates Mosberg both as an individual and as owner/operator of those entities.

including Mosberg's affordable housing obligations to the Township and the portion of sewer and water collection fees Mosberg was required to pay to the Township. Id. The disputes involved "[m]illions of dollars in judgments, settlements, and legal fees ...." Id.

The Attorney served as the Planning Board's legal advisor, rendering advice on pending development applications and representing the Board concerning all litigation. Id. at ¶ 1e. At times, the Attorney also represented the Township concerning litigation between the Township and Mosberg. Id. at ¶ 1f. From 1996 through 2003, the Attorney served on the mediation team for the Council of Affordable Housing, which team was assembled to mediate affordable housing disputes between the Township and Mosberg, among other developers. Id. The Attorney, further, participated in settlement negotiations regarding the sewer and water fee disputes.

According to the Indictment, from 1997 through 2007, the Attorney used his position as Planning Board attorney and, at times, on behalf of the Township directly, to "assist MOSBERG with development-related business and litigation involving the Township and the Planning Board, without the public's knowledge, as specific opportunities arose." Count 1, ¶¶ 3, 4. For example, in 1998, the Attorney represented the Township in litigation involving another developer who sought to develop a residential property known as Mazdabrook. Count 1, ¶ 10c. After the Township prevailed in that litigation, "Mosberg received a secret recommendation from the Attorney that Mosberg purchase Mazdabrook and apply to build houses rather than apartments." Id. The Attorney knew that the Township would approve that type of

application. Mosberg heeded the Attorney's advice and, upon receipt of the development application, the Attorney allegedly expedited its approval. See id.

In addition, the Indictment alleges that, from about 1997 through 2005, Mosberg was engaged in litigation with the Township over sewer-connection fees related to previously executed developer agreements between Mosberg and the Township. Count 1, ¶ 10a. Allegedly, the Attorney "endors[ed] developer's agreements between the Township and MOSBERG entities that undermined the Township's legal position in the litigation." Id. at ¶ 10b. The applications recommended by the Attorney supported Mosberg's method of calculating sewer-connection fees rather than that of the Township, and exempted Mosberg from the payment of any fees. Id.[2]

Several other official actions are alleged in the Indictment. For one, the Attorney expedited development applications for Mosberg on a continuing basis. Count 1, ¶ 10c. The Attorney, further, disclosed confidential Township litigation strategy to Mosberg, to the Township's detriment. Count 1, ¶ 10d. Lastly, in 2006, Mosberg is alleged to have offered the Attorney a six-figure payment in exchange for the Attorney's official assistance in "resolving outstanding litigation and obtaining Planning Board approval to build additional housing units at Parkside Gardens," one of Mosberg's developments. Id. This transaction was never completed, however, because the grand jury's investigation became public before any payment was made. Id.

---

[2] It is not clear from the Indictment whether both of these provisions existed in each developer agreement endorsed by the Attorney, or if some agreements included favorable calculations while others completely exempted Mosberg from payment.

The Indictment alleges that, beginning in 2002, Mosberg engaged in favorable real estate deals with several of the Attorney's family members as a means of rewarding the Attorney for his assistance. Count 1, ¶¶ 5, 6a. These deals included, *inter alia*, discounted purchase prices, free property upgrades, lenient settlement dates, and the waiver of contract contingencies. Id. Certain of the properties purchased by the Attorney's family members were "flipped," *i.e.*, purchased and then quickly resold, which resulted in a profit for the family member.

One such real estate transaction earned the participating family member a profit of $58,955, before capital gains tax. Id. at ¶ 6a(ii) ("Property #3"). According to the Indictment, Mosberg facilitated this transaction by allowing the family-member, in May of 2002, to enter into a contract to purchase the property for $275,000. That contract provided that the family-member purchaser was to close on the property "upon issuance of a certificate of occupancy ...." Id. at ¶ 5b. When the certificate of occupancy was issued in November of 2002, Mosberg did not enforce that contract provision and, instead, allowed the family-member purchaser to close three months later in February of 2003. Id. at ¶ 6a. A few months later, in June of 2003, the property was sold to a third party for $360,000, resulting in the $58,955 profit. Id.

Importantly, the Indictment further alleges that some of the Attorney's family members transferred a total of $36,000 of the sale proceeds to the Attorney's bank account. Count 1, ¶ 8. The deposits to his bank account were not directly transferred there, but were "concealed and transferred through various bank accounts held by

certain members of the Attorney's family." Id.  In short, the Indictment alleges that, by "allow[ing] the Family Members to successfully flip residential properties and derive substantial proceeds from their sales," Mosberg provided monies and personal benefits, both directly and indirectly, to the Attorney.  Id. at ¶ 7.

Despite receipt of certain of the real estate sale proceeds, the Attorney did not disclose his relationship with Mosberg, and/or the real estate transactions involving Mosberg and the Attorney's family members, to the Township or Planning Board. Count 1, ¶ 9.  He, further, failed to disclose any receipt of monies or benefits from the real estate transactions on his annual Local Government Ethics Law Financial Disclosure Statements filed in 2004 and 2007.  Id.; Count 5 and 7.  Under New Jersey's Local Government Ethics Law, "local government officers" must file an annual financial disclosure statement specifying "[e]ach source of income, earned or unearned, exceeding $2,000 received by the local government officer or a member of his immediate family during the preceding calendar year."  N.J.S.A. 40A:9-22.6(a)(1).[3]  In addition to disclosing income, each local government officer must also disclose "[e]ach source of gifts, reimbursements or prepaid expenses having an aggregate value exceeding $400 from any single source . . . received by the local government officer or a member of his immediate family during the preceding calendar year."  Id. at (a)(3). Further, the officer must disclose "[t]he address and brief description of all real

---

[3]       According to New Jersey Attorney General Opinion No. 91-0133, 1991 WL 527647 (November 1, 1991), planning board attorneys are "local government officers" for purposes of the Local Government Ethics Law.  Id. at *2.

property in the State in which the local government officer or a member of his immediate family held an interest during the preceding calendar year." The Indictment alleges that the Attorney's failure to disclose on his financial disclosure forms the benefits and monies he and his children received was done in an attempt to conceal the bribery-based conspiracy. Id. at Count 1, ¶ 9.

Based on Mosberg's and the Attorney's allegedly improper relationship, and the attendant, though convoluted, exchange of monies, the Indictment asserts that Mosberg and the Attorney engaged in a scheme to defraud the Township of the Attorney's honest services. Specifically, the Indictment charges one count of conspiracy to commit honest services fraud in violation of 18 U.S.C. § 1349 (Count 1); five counts of honest services fraud in violation of 18 U.S.C. §§ 1341 and 1346 (Counts 2-7), and bribery affecting federal funds in violation of 18 U.S.C. § 666(a)(2) (Counts 8-11). As noted, Mosberg is, further, charged with aiding and abetting in Counts 2-11, in violation of 18 U.S.C. § 2.

## B. Procedural History

The procedural history of this criminal proceeding is protracted and merits separate account. The Government originally indicted Mosberg on September 18, 2008, charging him with one count of conspiracy to commit honest services fraud in violation of 18 U.S.C. § 1349 (Count 1); five counts of honest services fraud in violation of 18 U.S.C. §§ 1341 and 1346 (Counts 2-7), and bribery affecting federal funds in violation of 18 U.S.C. § 666(a)(2) (Counts 8-11). The original indictment also charged him with aiding and abetting, under 18 U.S.C. § 2.

In this earlier indictment, the Attorney was primarily described as the Planning Board Attorney or "PB Attorney." Stating that the Attorney also worked directly for the Township in some instances, the indictment alleged that the Attorney was appointed as "interim Township Attorney" in 2005, and that he served in that capacity "for a time." Indictment dated Sept. 18, 2008, Count I, ¶ 1d, 1f.[4] The only specific instance of the Attorney's role as interim Township Attorney mentioned in the indictment is his alleged representation of the Township in connection with the Township's negotiation over Mosberg's Parkside Gardens development. Id. at ¶ 1f.

The scheme to defraud was described, in the original indictment, as a scheme to defraud the Township of the Attorney's honest services "pursuant to (a) New Jersey law and (b) his state common law obligation as a fiduciary for the public ...." Indictment dated Sept. 18, 2008, Count I, ¶ 2. Based on these state law sources, the indictment asserted, the Attorney was obligated to "refrain from receiving bribes and other corrupt benefits . . . ; and [to] disclose conflicts of interest and other material information in matters over which the [ ] Attorney exercised, and attempted to exercise, official authority and discretion, that resulted in his direct and indirect personal and financial gain." Id. The indictment also alleged that Mosberg offered, though he did not ultimately give, the Attorney a six-figure corrupt payment.

Notably, two of the five honest services fraud counts under 18 U.S.C. § 1341 and

---

[4] As explained below, this indictment included two pages both numbered "4" that contained differing dates describing when the Attorney was appointed as interim Township Attorney. I reference here the first of those two dates. The second page 4 stated that the Attorney was appointed in 2006 rather than 2005.

§ 1346 were for mailings, by the Attorney, of Local Government Ethics Law Financial Disclosure Statements. The indictment alleged, in Counts 5 and 7, that these disclosures fraudulently failed to disclose the monies and benefits that the Attorney received from Mosberg. <u>See</u> Indictment dated Sept. 18, 2008, Counts 2-7, ¶ 4. Specifically, the indictment asserts that it was part of the scheme for the Attorney not to disclose his receipt of monies and benefits on his disclosure forms, or to otherwise not disclose his receipt of the monies and benefits to the Planning Board. <u>Id.</u>, Count 1, ¶ 7.

Shortly after Mosberg was indicted, he moved for a Bill of Particulars pursuant to rule 7(f) of the Federal Rules of Criminal Procedure. Through that motion, Mosberg sought "key facts, dates, and events that form the bases of the Government's claims that [he] engaged in illegal conduct." Memo of Law in Supp. of Def. Mot. for a Bill of Particulars at 2. Following an extended briefing schedule, the Court held oral argument on the motion on January 29, 2009. The Court denied Mosberg's motion based on "certain representations [made] during the hearing" by the Government, whereby the Government agreed to provide more precise dates as the Government's "preparation continue[d]." January 29, 2009 Transcript at 13:7-12; Order dated January 29, 2009.

Mosberg then filed a motion to dismiss the indictment in February 2009, arguing, <u>inter alia</u>, that the indictment did not allege facts constituting <u>quid pro quo</u> bribery. In connection with that motion, Mosberg also urged the Court to conduct an <u>in camera</u> review of the grand jury proceeding that resulted in the September 18, 2008

indictment. Mosberg argued, in support of his request for <u>in camera</u> review, that the indictment erroneously included two pages numbered "4," which each contained distinct allegations regarding the date that the Attorney was appointed as interim Township Attorney. The first page 4 stated that the Attorney was appointed "[i]n or about 2005," while the second page 4 stated that he was appointed "[i]n or about May 2006." In light of this discrepancy, Mosberg asked the Court to conduct an <u>in camera</u> review for the purpose of determining whether "this or any other error so infected the Grand Jury proceeding that the Indictment is defective and should be dismissed." Def. Ltr. dated Mar. 3, 2009 at 2.

Shortly thereafter, on March 26, 2009, the Government filed a Superceding Indictment. This indictment corrected the duplicate page 4 error, and removed any reference to the year during which the Attorney was appointed as interim Township Attorney. This indictment stated merely that the Attorney served as interim Township Attorney "at certain times." Superceding Indictment, Count 1, ¶ 1d. In addition, the Superceding Indictment removed the reference to the Attorney serving as interim Township Attorney in the Parkside Gardens development negotiations. In its place, the Superceding Indictment alleges that "[t[he Attorney, on certain occasions, also represented the Township in litigation in which the Township and MOSBERG development entities were parties." <u>Id.</u>

Apart from these changes, the Superceding Indictment mirrored the original indictment. As in the original indictment, the Superceding Indictment alleged, in Counts 5 and 7, that the Attorney failed to disclose the monies and benefits that the

Attorney received from Mosberg on his local government disclosure forms. <u>See</u> Superceding Indictment, Counts 2-7, ¶ 4. Moreover, the Superceding Indictment contained the allegation that it was part of the overarching fraudulent scheme for the Attorney to conceal his receipt of the monies and benefits. <u>Id.</u>, Count 1, ¶ 9.

The next month, in April of 2009, Mosberg filed another motion for a Bill of Particulars, this time for clarification of the Superceding Indictment. This motion sought details about the dates that the Attorney served as Interim Township Attorney, as well as the specific litigations in which, or development-related business for which, he served as either Planning Board or Interim Township Attorney. In this way, the Defendant sought to have the Government more clearly delineate the Attorney's role with respect to each Mosberg-related matter in the Township. The motion, further, sought the specific date in 2006 that Mosberg allegedly offered the six-figure payment to the Attorney. That same month, Mosberg filed a motion seeking <u>in camera</u> review of the grand jury proceedings that resulted in the original indictment. The basis for this motion was the same as that underlying the second motion for a Bill of Particulars. <u>See</u> Def. Notice of Mot. to have the Court Conduct <u>In Camera</u> Review at 2.

The Court held oral argument on the motion for a Bill of Particulars, and on the motion for <u>in camera</u> review, on June 1, 2009. At that hearing, the Court orally ordered the Government to identify the litigations in which the Attorney acted as an agent for the Township, the dates of the lawsuits, and the names of any other attorneys that represented the Township in those suits. The Government responded on June 16,

2009, with a table that listed seventeen lawsuits between Mosberg and the Township. See Govt. Ltr. dated June 16, 2009 at 1. For each lawsuit, the table specifies the dates of the litigations and the "other attorneys" retained by the Township. Id. at 3-4.

A letter introducing the table further explained, with respect to certain of the denoted lawsuits:

> As to lawsuit Nos. 1-6, 8 and 10-15, [the Attorney] was not counsel of record but was involved on behalf of the Township from in or about 2002 to in or about June 2003 and signed a settlement agreement on March 2, 2005. As to lawsuit No. 16, [the Attorney] was counsel of record on behalf of the Planning Board. As to lawsuit No. 9, [the Attorney] was counsel of record on behalf of the Township. As to lawsuit Nos. 7 and 17, [the Attorney] was counsel of record for both the Township and Planning Board. As to lawsuit Nos. 7, 9, 16 and 17, the period of [the Attorney]'s representation was throughout the suit except that in lawsuit No. 9 [the Attorney]'s representation ended on March 7, 2007. [the Attorney] acted as an agent of the Township with respect to each of the suits in which he was involved.

Id. at 1.

The month following the June oral argument, in July of 2009, Mosberg filed a motion to dismiss the Superceding Indictment. After another round of extensive briefing, the Court held oral argument on this motion on October 14, 2009. As with the prior motion to dismiss, Mosberg argued that the Superceding Indictment failed to adequately allege a quid pro quo bribery, among other challenges to that indictment.

Importantly, while the Government interpreted Counts 5 and 7 of the Superceding Indictment as part of an overall quid pro quo bribery scheme, both Mosberg's and the Government's legal arguments treated Counts 5 and 7 as falling

12

under a failure to disclose/conflict of interest theory of honest services fraud. As noted, Counts 5 and 7 of that indictment were rooted in the allegedly fraudulent local government ethics forms mailed by the Attorney, that failed to disclose monies or benefits he received from Mosberg. At that time, prior to the Supreme Court's decision in Skilling v. United States, 130 S.Ct. 2896 (2010), there were two theories by which it was believed that honest services fraud could be alleged: a bribery-based theory or a conflict-of-interest-based theory. Thus, Mosberg's legal challenges to Counts 5 and 7, at that time, focused on whether Mosberg had knowledge of the Attorney's mailing of fraudulent disclosure forms—not on whether such mailings could properly form the basis of an honest services fraud count.

In January of 2010, while Mosberg's motion to dismiss the Superceding Indictment was still pending, the Government petitioned the Court, with Mosberg's consent, to adjourn the proceedings pending issuance of the Supreme Court's Skilling decision. Finding that the parties' request was reasonable, the Court adjourned all pending proceedings at that time. When the Supreme Court had not issued its decision by May of 2010, the Court administratively terminated Mosberg's motion to dismiss on May 10, 2010, in order to judiciously manage its docket.

Skilling was ultimately issued on June 24, 2010, and, shortly thereafter, the Court held a conference call on July 29, 2010, with the Government and Mosberg, to address how the Government intended to proceed. As explained in more detail below, Skilling held that a public official's failure to disclose a conflict of interest could no longer serve as an independent theory of honest services fraud. See 130 S.Ct. at 2933-

13

34.  Only bribery-based theories remained a valid means of indictment under the honest services fraud statute, 18 U.S.C. § 1346.  Hence, during the conference call, and after confirming that the Government intended to pursue its prosecution of Mosberg, the Government requested additional time to decide whether it would seek to strike certain allegations and/or counts from the Superceding Indictment or whether it would return to the grand jury to seek a new indictment that took into account the <u>Skilling</u> ruling.  Within a short period of time, the Government informed the Court that it would return to the grand jury.  Govt. Ltr. dated Aug. 4, 2010.  Based on communications with the parties, the Court understands that a new grand jury, different from the one that had returned the Superceding Indictment, had been empaneled by that time.

On October 14, 2010, the Government filed the Second Superceding Indictment.  Mosberg then filed the instant motion to dismiss on March 25, 2011, along with another request for <u>in camera</u> review of the grand jury proceedings.  After extensive briefing, including a request to file an over-length brief, the Court held oral argument on June 10, 2011.  It became apparent at oral argument that supplemental briefing was required to address some of the Court's questions; therefore, the Court granted Mosberg and the Government additional time to file supplemental letter briefs.  Now, at long last, the Court rules on Mosberg's motion to dismiss.

## II.  STANDARD OF REVIEW

On a motion to dismiss, a court reviews the indictment to determine whether it:

(1) contains the elements of the offenses intended to be

charged, (2) sufficiently apprise[d] the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.

United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007). An indictment may not merely recite the essential elements of the offense charged, it must allege specific facts that fall within the scope of the relevant criminal statute. Id.; United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007). All facts alleged in the indictment must be taken as true, and the court is to employ a "common sense construction" thereof. United States v. Hodge, 211 F.3d 74, 76 (3d Cir. 2000).

In United States v. Bergrin, 650 F.3d. 257 (3d Cir. 2011), the Third Circuit recently affirmed the limited scope of the court's inquiry on a motion to dismiss. The Court of Appeals reiterated that, "[w]hile detailed allegations might well have been required under common-law pleading rules, ... they surely are not contemplated by Rule 7(c)(1)." Id. at 264 (quoting United States v. Resendiz–Ponce, 549 U.S. 102, 110 (2007)). The court, further, emphasized that although courts "may look for more than a mere 'recit[ation] in general terms [of] the essential elements of the offense, . . . [a] ruling on a motion to dismiss is not . . . a permissible vehicle for addressing the sufficiency of the government's evidence." Id. at 264-65 (citations omitted). Indeed, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." Id. at 264 (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989)). According to the Bergrin court, this is a

"narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." <u>Id.</u> at 268.

<u>Bergrin</u> further clarified language from <u>U.S. v. Panarella</u>, 277 F.3d 678 (3d Cir. 2002), that an indictment based on facts "beyond the reach of the relevant criminal statute" fails to state an offense. <u>Bergrin</u>, 650 F.3d at 264-65. The <u>Bergrin</u> court expressly noted that <u>Panarella</u> has been taken out of context by courts to inappropriately imply that a court may "inquir[e] into what the Government will be able to prove at trial" in the context of a motion to dismiss an indictment. <u>Bergrin</u>, 650 F.3d at 271. Hence, <u>Bergrin</u> makes clear that, although an indictment fails to state an offense if the facts alleged fall beyond the scope of the criminal statute "as a matter of statutory interpretation," <u>id.</u> at 264-65, no deeper inquiry into the veracity or evidentiary value of the indictment's allegations is permitted.

## III.  DISCUSSION

Mosberg challenges each count of the Indictment as insufficiently pled. His primary argument is that the Indictment does not plead a <u>quid pro quo</u> bribery theory of honest services fraud. He further argues that Counts 5 and 7 of the Indictment, which are rooted in the Attorney's failure to disclose the monies and benefits he received from Mosberg on his local government ethics disclosure forms, constitute an impermissible, back-door attempt by the Government to charge him on the failure to disclose theory of honest services fraud rejected by <u>Skilling</u>. The Government, in contrast, argues that the Indictment adequately charges a <u>quid pro quo</u> bribery theory, and that Counts 5 and 7 are mailings, like any other, that further the bribery scheme.

Mosberg makes additional arguments as to the other counts of the Indictment, but I address these heavily-debated challenges first before turning to his remaining arguments.

As an initial matter, and to provide context for my discussion, I first clarify the scope of the Indictment as a whole. The Indictment cites to both the general mail fraud statute, 18 U.S.C. § 1341, and the honest services fraud statute, 18 U.S.C. § 1346. Section 1341 reaches money-and-property based fraud, whereas section 1346 reaches fraud based on the deprivation of a public official's honest services.

While both statutes are cited in the Indictment, it is clear from the Indictment's description of the object of the conspiracy that only honest services fraud is charged. As explained by the Third Circuit in <u>Riley</u>, it is the object of the scheme that determines whether a given scheme alleges general mail fraud or honest services fraud. <u>See</u> 621 F.3d at 327 ("to distinguish between the fraud of §§ 1341 and [18 U.S.C. § 666], as opposed to that of § 1346, one must look to the object of the deprivation and not the underlying fraudulent act."). So, allegations that a bribery scheme resulted in financial loss to a township would constitute money and property-based fraud under section 1341.[5] <u>See id.</u> at 327. The Indictment here alleges that "MOSBERG . . . devise[d] a scheme and artifice to defraud the Planning Board, the Township and its citizens of the right to the Attorney's honest services . . . , contrary to . . . Sections 1341

_____

[5]      In <u>Riley</u>, for example, the Third Circuit addressed allegations based on a failure to disclose a conflict of interest in connection with a scheme to defraud the City of Newark of money or property. <u>Id.</u> "[T]he risk of exposure to such a loss of money or property [was] sufficient [in that case] to distinguish §§ 1341 . . . fraud from honest services fraud [under section 1346]." <u>Id.</u>

and 1346." Counts 2-7, ¶ 2 (emphasis added). The Indictment makes no reference to the deprivation of money or property. Thus, I conclude that the only scheme alleged is that of honest services fraud and not money-or-property mail fraud under section 1341. With the scope of the Indictment clarified, I now turn to the parties' arguments.

### A.   The Bribery Theory - <u>Quid</u> <u>Pro</u> <u>Quo</u> Agreement

With respect to Counts 2-7 of the Indictment, which counts charge violations of the honest services fraud statute, 18 U.S.C. § 1341, Mosberg contends that the Indictment fails to allege a "<u>quid</u> <u>pro quo</u>" bribery scheme consistent with <u>Skilling</u> and with pre-<u>Skilling</u> case law. The Indictment alleges that Mosberg "knowingly and willfully did devise and intend to devise a scheme and artifice to defraud the Planning Board, the Township and its citizens of the right to the Attorney's honest services ...." Indictment, Counts 2-7, ¶ 2-3. As for the bribery allegations, the Indictment states that Mosberg "g[a]ve the Attorney . . . a stream of concealed bribes . . , often in the form of favorable real estate transactions, <u>in exchange for</u> the Attorney exercising . . . official authority . . . to assist MOSBERG ...." Indictment, Counts 2-7, ¶ 3 (emphasis added). The Indictment, further, alleges that there was an express agreement in 1998, with respect to Mazdabrook, and a general bribe in 2006.[6]

Relying primarily on <u>U.S. v. Kemp</u>, 500 F.3d 257 (3d Cir. 2007), Mosberg argues that the Government must allege an explicit or implicit agreement, *i.e.*, that Mosberg and the Attorney agreed that the former would provide real estate deals to the latter's

---

[6]    While this language is found in the conspiracy count allegations, a count may incorporate by reference allegations from other counts. <u>United States v. Kemp</u>, 500 F.3d 257, 280 (3d Cir. 2007) (citing Fed.R.Crim.Pro. 7(c)(1)).

children in exchange for favorable treatment.  In Mosberg's words, "there [must] be a two-way agreement involving a promise or commitment from the public official to perform official acts in exchange for a promise or commitment that the official will receive a thing of value."  Def. Mov. Br. at 12.

As Mosberg correctly argues, the <u>Kemp</u> Court held that "the *quid pro quo* requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor."  500 F.3d at 282.  Applying that rule of law to the instant Indictment, Mosberg finds it deficient, arguing that the Indictment alleges only a "quid" and "quo" but no "pro."  Def. Mov. Br. at 14.  Specifically, Mosberg argues that the Indictment merely states that he gave favorable real estate deals to the Attorney's children (the quid) and that the Attorney provided favorable treatment to him (the quo).  Nowhere in the Indictment, Mosberg argues, is the allegation that Mosberg and the Attorney agreed, implicitly or explicitly, to benefit each other in this manner.  Without an allegation of this sort of agreement, Mosberg contends, the Indictment is insufficient as a matter of law.

Contrary to Mosberg's assertion, <u>Kemp</u> does not support his argument.  For one, the indictment language approved by the <u>Kemp</u> court mirrors that found in the instant Indictment.  In ruling that the indictment sufficiently alleged a bribery theory, the <u>Kemp</u> Court quoted the following language from that indictment:

> The indictment refers to "the benefits that HOLCK and UMBRELL extended to Kemp with the intent to influence KEMP's official actions," and charges that "defendants

> GLENN K. HOLCK and STEPHEN M. UMBRELL, on behalf of their employer, Commerce Bank, provided benefits to Kemp in the form of otherwise unavailable loans in exchange for favorable decisions by KEMP as Treasurer of Philadelphia."

Id. at 280-81. According to Kemp, "[t]hese allegations were sufficient to charge Holck and Umbrell with honest services fraud under a bribery theory ...." The only difference between the Kemp indictment language and the Indictment here is that there is no express allegation that Mosberg had the "intent to influence" Montefusco. Indeed, Mosberg concedes that the 2006 allegation, on its own, sufficiently alleges a quid pro quo arrangement, which allegation does not include the "intent to influence" language. See Indictment, Count 1, ¶ 10d ("MOSBERG offered the Attorney a 'six-figure' bribe payment in exchange for the Attorney's official assistance ....") (emphasis added).

In addition, the Third Circuit sanctioned the "in exchange for" language as evincing an "intent to influence" in its recent decision in United States v. Bryant, 655 F.3d 232 (3d Cir. 2011). In Bryant, the Third Circuit explained:

> The Supreme Court has explained that, as "[b]ribery requires intent 'to influence' an official act or 'to be influenced' in an official act ..., there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act."

655 F.3d 232 at *5 (emphasis added) (quoting United States v. Sun–Diamond Growers, 526 U.S. 398, 404–05, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999) (emphasis in original)). See also Beldini, 2011 WL 3890964 at *2 (using "in exchange for" to describe quid pro quo bribery allegations required under section 666). As I explained in my lower court decision in Bryant, "the Indictment's allegation of an 'exchange' necessarily signifies

that [the public official] accepted the bribe . . . with the intent to be influenced in the official actions listed in the Indictment." 556 F.Supp.2d at 390-91 (citing <u>Sun-Diamond</u>, 526 U.S. at 404-05). <u>Cf</u>. <u>U.S. v. Bahel</u>, --- F.3d ---, 2011 WL 5067095 at *19 (2d Cir. 2011) (holding that "in return for" language in jury instructions sufficiently communicates the <u>quid</u> <u>pro</u> <u>quo</u> element).

Furthermore, the Indictment here satisfies the motion to dismiss standard reaffirmed by the Third Circuit in <u>Bergrin</u>. As noted, on a motion to dismiss, the court's analysis must center on whether the indictment (1) contains the elements of the offenses charged, (2) sufficiently apprised the defendant of what he must defend against, and (3) "allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." <u>Id</u>.

The Indictment alleges the elements of honest services fraud, and apprises Mosberg of the sort of bribery scheme that he must defend against—favorable real estate deals in exchange for expediting or favorably resolving Planning Board matters and Township litigation. In this way, the Indictment also gives Mosberg sufficient factual orientation to defend against any attempt by the Government to subsequently indict him for the same crime. The Court understands that Mosberg would prefer more detailed factual allegations, however, the Government is not obligated to provide those details at this juncture. If the Government is unable to support its theory through facts adduced at trial, then the sufficiency of the Government's proofs may be considered on the basis of that record. Therefore, with similar language—in exchange for—being approved by <u>Kemp</u>, and <u>Bryant</u>, and in light of <u>Bergrin</u>'s admonition that

detailed allegations are not contemplated by Rule 7(c)(1), 650 F.3d. at 264, I conclude that the Indictment sufficiently alleges a <u>quid</u> <u>pro</u> <u>quo</u> bribery.

In a related argument, Mosberg appears to rely on <u>U.S. v. Inzunza</u>, 638 F.3d 1006 (9th Cir. 2011), for the proposition that an express agreement is required, thereby suggesting that the Indictment is deficient for failing to allege that Mosberg and Montefusco entered into an explicit bribery agreement.[7] However, in his reply, Mosberg clarifies that <u>Inzunza</u> is cited solely for the proposition that an indictment "cannot rely on suspicion alone to establish a link between the alleged benefits conferred to Montefusco and the alleged favorable official treatment furnished by Montefusco." Def. Reply at 6 n.3. As an initial matter, <u>Inzunza</u> involved a sufficiency of the evidence challenge. Moreover, the <u>Inzunza</u> court's full comment was "[s]uspicion alone will not support criminal liability; on this record, a rational juror would entertain <u>reasonable doubts that preclude a finding of guilt on the counts in question</u>." <u>Id.</u> (emphasis added). Needless to say, this is not the standard applicable on a motion to dismiss.

The Third Circuit's recent affirmance of <u>Bryant</u>, further supports my conclusion that a <u>quid</u> <u>pro</u> <u>quo</u> arrangement has been alleged, and that a bribery agreement may be implicit as opposed to explicit in nature. In <u>Bryant</u>, former New Jersey state senator Wayne Bryant was charged with entering into a bribery scheme with R. Michael Gallagher, the former Dean of the School of Osteopathic Medicine ("SOM") of

---

[7] Mosberg actually cites a prior version of the <u>Inzunza</u> opinion. It was amended on April 12, 2011, and I cite to the amended opinion, which includes the same language from the prior opinion relied upon by Mosberg.

the University of Medicine and Dentistry of New Jersey ("UMDNJ"). The indictment in that case, as concisely explained by the <u>Bryant</u> court, "alleged [a] *quid pro quo* arrangement in which Gallagher gave Bryant a 'low-show' job at SOM (meaning he provided only minimal or nominal services) as a 'Program Support Coordinator,' in which position he received an annual salary of $35,000 (and a $5,000 bonus), in exchange for Bryant's efforts as Chairman of the Senate Appropriations Committee to funnel State funding to SOM." <u>Id.</u> at *1. Both Bryant and Gallagher were convicted for their roles in the bribery scheme.

On appeal, the Third Circuit approved the following lower court jury instruction that acknowledged implicit <u>quid</u> <u>pro</u> <u>quo</u> agreements. The jury instruction provided:

> The evidence of a *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the defendant] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity.

<u>Id.</u> at *5.

Moreover, the Third Circuit rejected Bryant's and Gallagher's argument that the Government failed to prove the existence of a <u>quid</u> <u>pro</u> <u>quo</u> agreement. In rejecting that argument, the court looked to specific facts adduced at trial from which the jury could have concluded that an implicit agreement existed. In light of these facts, the Third Circuit held that it was within the jury's province to conclude that an implicit <u>quid</u> <u>pro</u> <u>quo</u> agreement existed.

Specifically, the Circuit reasoned that "based on the timing of Bryant's official acts, a jury could infer that Bryant intended to accept a 'stream of benefits' in the form

of a salary and benefits from SOM in exchange for his official acts over the course of his nearly three-year employment there." Id. Relatedly, and with respect to Gallagher in particular, the court held that his intent to influence was proved through circumstantial evidence. Id. at *7.

While Bryant involved a sufficiency of the evidence challenge, as opposed to a motion to dismiss, I find its reasoning instructive here. Bryant illustrates the type of facts from which a jury may ultimately determine guilt. This ruling, combined with my analysis of the Indictment language, make clear that the Indictment here sufficiently alleges a quid pro quo arrangement, and that an explicit agreement need not be expressly alleged in the Indictment.

Mosberg further argues that the time span between the originating date of the conspiracy (1997) and the first benefit (2002) is too vast to support the inference that an agreement was implicitly reached. In addition to this argument, he takes further issue with the allegation that the Attorney took official action before the alleged favorable real estate deal-payments from Mosberg began. In short, Mosberg argues that the benefits must be provided in "close proximity" to the official action in order for an agreement to be inferred. Def. Mov. Br. at 17.

Mosberg is correct that many cases inferring a quid pro quo agreement involve less than five years between the origin of the scheme and the first bribe payment. For example, Mosberg points to language in U.S. v. Mariano, 316 Fed.Appx. 99 (3d Cir. 2008), that the defendant gave a public official "three separate payments, each of which occurred in close proximity to [the official] acting on behalf of [the defendant]."

24

Id. at 102.  Bryant is another example where there was a short time frame involved —

Bryant attempted to exercise official action in favor of the private party in that case

only six days after Bryant was granted a fabricated employment position by that party.

Bryant, 655 F.3d at 241.  As noted, the Third Circuit concluded that the jury in that

case could have inferred an implicit quid pro quo arrangement from the close proximity

of time between Bryant's official acts and his appointment to the fabricated position.

From that close proximity, the Court concluded, a jury could infer that Bryant intended

to accept a 'stream of benefits' in the form of a salary and benefits from SOM in

exchange for his official acts over the course of his nearly three-year employment

there."  Id. at *5.

 Simply because there are cases in which a shorter time frame was alleged or

proven, however, does not mean that close proximity is required as a matter of law.

Mosberg has not pointed to any language in these cases, or others, that create a bright-

line rule imposing a temporal limit on implicit quid pro quo agreement allegations.

 In this connection, I find the Third Circuit's decision in Bergrin instructive.

Bergrin involved a criminal Racketeer Influenced and Corrupt Organizations Act

(RICO) charge.  One of the elements of a RICO charge is that the members of a RICO

scheme engaged in a "pattern" of  predicate acts.  Bergrin, 650 F.3d. at 267.  The

government's indictment was dismissed by the district court because, in its view, there

must be similar methods employed, or some temporal proximity linking, the predicate

acts in order for a pattern to exist.  Id.

 The Third Circuit expressed disapproval of the district court's imposition of a

temporal proximity requirement where there was no language in the RICO statute or decisional law to support that limitation. The Third Circuit reasoned:

> In addition to making impermissible factual findings, the District Court also penalized the Government for failing to allege facts that are unrelated to any required element of a RICO offense. For example, the Court suggested that, to constitute a "pattern," the predicate acts must be similar in ways <u>not actually required by the statute or judicial precedent</u> (e.g., that there must be similar methods employed or some temporal proximity linking the predicate acts) . . . These factual averments are not required to prove a RICO case.

<u>Bergrin</u>, 650 F.3d. at 273 (emphasis added).

Likewise, here, there is no language in the honest services fraud statute or judicial precedent that requires bribes or benefits to be paid near the beginning of the scheme to defraud. Nor is there binding precedent stating that the benefits must be temporally linked to the payment or, as Mosberg further argues, that the bribe payment must precede the official action.[8] Therefore, while Mosberg's argument that the payments and official actions should be made in close proximity has intuitive force, the Court finds no basis for imposing such a pleading requirement as a matter of law, as contradistinguished from whether such evidence at trial could support an inference of an implicit <u>quid</u> <u>pro</u> <u>quo</u> arrangement. Indeed, this was the case in <u>Bryant</u>, where

---

[8]    In this connection, Mosberg quotes <u>U.S. v. Schaffer</u>, 183 F.3d 833 (D.D.C. 1999) <u>vacated on other grounds by</u> 240 F.3d 35 (D.C. Cir. 2001), for the proposition that "bribery typically involves an intent to affect the <u>future actions</u> of a public official through giving something of value, and receipt of that thing of value then motivates the official act." <u>Id.</u> at 841. Nothing in <u>Schaffer</u>, however, suggests that a bribery payment may not be paid after an official action. <u>Schaffer</u> suggests only that such a bribery scheme might be an atypical one.

the Third Circuit addressed proximity in the context of a post-trial sufficiency of the evidence challenge.

Moreover, whether a quid pro quo agreement is properly alleged is a case by case determination that depends upon the totality of the facts asserted—not just on whether a close proximity exists. This approach is consistent with the standard on a motion to dismiss; "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." Bergrin, 650 F.3d at 264 (quoting Rankin, 870 F.2d at 112). Viewing the Indictment in this manner, then, I turn to the pertinent allegations.

The Indictment alleges that the Attorney endorsed developer agreements that benefitted Mosberg, and undermined the Township's legal position, from 1997 through 2005, and that Mosberg provided the favorable real estate deals from 2002 through 2006. There is a significant overlap between these two times frames, which overlap suggests the existence of an ongoing bribery relationship. Moreover, the Indictment alleges that Mosberg "told the Attorney, in substance and in part, that if the Attorney helped MOSBERG related to the development approval for Mazdabrook, MOSBERG would help the Attorney." Indictment, Count 1, ¶ 10c. While Mosberg could have theoretically provided this "help" shortly after the first favorable official action was taken, that Mosberg provided the initial real estate deal four years later, in 2002, does not necessarily undercut the existence of the bribery scheme. Should this matter reach trial, a jury could ultimately conclude that such a complicated and involved, real-estate

27

based scheme took more time to implement than the typical cash bribe payment scheme.

Additionally, that both the Attorney and Mosberg allegedly concealed the real estate transactions further suggests the existence of an implicit <u>quid pro quo</u> agreement. The Indictment alleges that Mosberg told the Attorney, in early 2003, that "no one should know about [one of the favorable real estate transactions]," and that he "encouraged the Attorney to conceal material information, by not disclosing their arrangement." <u>Id.</u>, Count 1, ¶ 6c. The Indictment further alleges that the Attorney failed to disclose his receipt of the $36,000 in proceeds from one of the sales, and other benefits his children received, on his 2004 and 2006 local government ethics disclosure forms.

Additionally, in light of the several allegedly favorable actions that the Attorney provided from 2002 through 2006, the Indictment's allegation that Mosberg offered a six-figure bribe payment in 2006 for the Attorney's assistance in resolving the Parkside Gardens litigation, further suggests that an implicit agreement had been reached. <u>Id.</u> Taken together, these allegations point to an implicit <u>quid pro quo</u> agreement between Mosberg and the Attorney. The lack of close proximity between the first official action and the real estate transaction-payments does not render the allegations regarding a <u>quid pro quo</u> arrangement insufficient to support such a claim at the motion to dismiss stage.

Finally, Mosberg points to documents outside the pleadings to call into question the bases for of the Government's allegations. Such references are impermissible on

a motion to dismiss where the allegations must be taken as true.  Mosberg cites <u>U.S. v. Boren</u>, 278 F.3d 911 (9th Cir. 2002), for the proposition that the Court may consider allegations outside the four corners of the indictment.  <u>See</u> Def. Reply at 10 n.7.  <u>Boren</u>, however, explicitly acknowledges that "[i]n ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment," and thereafter states that it is only when a motion to dismiss is "premised on other grounds, such as that the indictment violates the defendant's right against double jeopardy, [that] a court may take evidence and make factual determinations."  <u>Id.</u> at 914.

Accordingly, the Court concludes that the Indictment sufficiently alleges an implicit <u>quid</u> <u>pro</u> <u>quo</u> agreement.  Mosberg's motion to dismiss Counts 2 - 7 for failure to allege a <u>quid</u> <u>pro</u> <u>quo</u> arrangement is denied.

**B.    Corrupt Intent**

In an argument similar to his <u>quid</u> <u>pro</u> <u>quo</u> argument, Mosberg contends that the Indictment fails to sufficiently allege that he had the corrupt intent to influence or reward the Attorney. He cites <u>United States v. McNieve</u>, 536 F.2d 1245 (8th Cir. 1976), <u>United States v. Rabbitt</u>, 583 F.2d 1014 (8th Cir. 1978), and <u>Unites States v. Czubinski</u>, 106 F.3d 1069, 1076 (1st Cir. 1997), in support of his contention.

Mosberg cites <u>McNieve</u> for the proposition that bribery monies must actually affect the performance of the official's duties.  Perhaps recognizing that this broad proposition is incorrect, Mosberg clarifies his argument in his reply brief by citing <u>U.S. v. Ozcelik</u>, 527 F.3d 88 (3d Cir. 2008).  <u>Ozcelik</u> holds that "while it is not necessary for

the official to actually change his performance," in order to "sustain a bribery conviction [it *is* necessary] that the official have the corrupt intent that, in exchange for the bribe, the official would be influenced in the performance of an act ...." Def. Reply at 19 n.14.

However, as Mosberg acknowledges, the inquiry is whether the official intended to allow himself to be influenced—not that he was <u>actually</u> influenced in the performance of his duty. See <u>Ozcelik</u>, 527 F.3d at 95 ("[A]cceptance of the bribe is the violation of the statute, not performance of the illegal promise"). Indeed, as one of Mosberg's other citations in his reply brief notes, <u>McNieve</u> is better understood as holding that where the scheme does not <u>contemplate</u> that the official will ever change his performance, there is no corrupt intent shown. See Def. Reply at 19 (citing <u>U.S. v. Brumley</u>, 116 F.3d 728, 734 (5th Cir. 1997)); <u>Brumley</u>, 116 F.3d at 734 ("If the employee renders all the services his position calls for, and if these and all other services rendered by him are just the services which would be rendered by a totally faithful employee, <u>and if the scheme does not contemplate otherwise</u>, there has been no deprivation of honest services.") (emphasis added).[9] Moreover, <u>McNeive</u> and <u>Ozcelik</u> involved public official defendants and, accordingly, focused on the official's intent.

The central question is whether Mosberg intended for the Attorney to exercise

---

[9]    McNieve is further factually distinguishable.  The government official in McNieve was a local plumbing inspector with no discretionary authority, who did not attempt to hide tips he received from a particular applicant.  The court itself described McNieve as a "unique case."  The allegations here differ from McNieve in that it is alleged that the Attorney possessed discretionary authority and funneled Township secrets to Mosberg that would otherwise not have been available to him.

discretion, even if Mosberg was incorrect in his assumption that the Attorney could, in fact, exercise that discretion.  The Indictment alleges that Mosberg sought the Attorney's assistance for "development-related business and litigation involving the Township . . . <u>without the public's knowledge</u>."  Indictment, Count 1, ¶ 4 (emphasis added).  The "without the public's knowledge" language is critical because it suggests that the arrangement between Mosberg and the Attorney was intended to be secret. Clandestine arrangements are clandestine for a reason, presumably a corrupt one.  In addition, the Indictment alleges that the bribe payments and benefits were "corrupt" <u>Id.</u>, Counts 2-7, ¶ 3.  Read together, these allegations sufficiently assert that Mosberg had the corrupt intent to influence Montefusco's actions as a public official.

Mosberg's citations to <u>Rabbitt</u> and <u>Czubinski</u> do not alter my conclusion.  The defendant-public officials in those cases did not possess any discretionary decisionmaking powers that could have potentially been affected by their receipt of bribes.  <u>See</u>  <u>Rabbitt</u>, 583 F.2d at 1025 (noting that the defendant-legislator "did not, in his official capacity, control the awarding of state contracts to architects."); <u>Czubinski</u>, 106 F.3d at 107 ("[the defendant's] official duty was to respond to informational requests from taxpayers regarding their returns, a relatively straightforward task that simply does not raise the specter of <u>secretive</u>, self-interested action, as does a discretionary, decision-making role.") (emphasis added).  Here, unlike both <u>Czubinski</u>, and <u>Rabbitt</u>, the Indictment alleges that the Attorney exercised his discretionary duties to assist Mosberg by, for example, disclosing secret information that created development opportunities for Mosberg (as with Mazdabrook) and assisted

Mosberg is negotiating more favorable litigation settlements.

To the extent Rabbitt could be read to support the proposition that an official—a legislator, in that case— must possess final decisionmaking authority in order to possess corrupt intent, at least one court has questioned this reasoning, noting that "[t]he fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight independent of their intrinsic merit." United States v. Holzer, 816 F.2d 304, 309 (7th Cir.1987) vacated on other grounds by McNally v. United States, 483 U.S. 350 (emphasis added). Indeed, as the First Circuit noted in United States v. Potter, 463 F.3d 9 (1st Cir. 2006), "[i]t is common knowledge that powerful legislative leaders are not dependent on their own votes to make things happen. The honest services that a legislator owes to citizens fairly include his informal and behind-the-scenes influence ...." Id. at 18. By analogy here, even without allegations that the Attorney had actual authority to direct the Township's actions, the Indictment sufficiently alleges that Mosberg intended for the Attorney to tailor his recommendations to the Township, and to exercise whatever element of discretion he possessed to influence the Township, in Mosberg's favor.

In other words, the Indictment sufficiently alleges corrupt intent because the alleged scheme contemplated that, as a result of the benefits Mosberg gave or would give the Attorney, the Attorney would be influenced in his dealings with, or advice to, the Township whenever an opportunity to benefit Mosberg arose. As I explained in my Bryant decision, "[w]hen an official makes a *quid pro quo* bribery agreement, explicitly

32

or implicitly, he ceases making decisions according to his best judgment . . . on behalf of all the citizens he serves, and allows the payor to place a thumb on the scale of his decision-making process." 556 F.Supp.2d at 392. This is because "in addition to whatever considerations he would have brought to bear regarding the merits of such official acts, he also has a corrupt consideration, the bribe." Id. at 392-93.

For this reason, "even if the official actions he ultimately takes in favor of the payor are unchanged, the [public official's] decision-making process is still influenced ...." Id. Indeed,

> an allegation that a [public official] "exchanged" official actions for a bribe necessarily means that the bribe had some influence on that discretion—even if, as things turned out, the official's actions were the same as they would have been absent the bribe. This is because the "exchange" removes discretion from the legislator—which he is obligated to exercise in the best interests of the public—and instead locks him into a position favoring one constituent, as dictated by the *quid pro quo* arrangement.

Id. (internal citation omitted). Similar to the influence the defendant-legislator in Bryant exercised on behalf of the private payor, the Indictment here alleges that Mosberg's and the Attorney's scheme contemplated that the Attorney would skew his advice to the Township to favor Mosberg.

Accordingly, I conclude that the Indictment's allegations are sufficient to allege corrupt intent and, therefore, deny Defendant's motion to dismiss Counts 2-7 on this basis.

## C. Ethics Disclosure Forms - Counts 5 and 7

Defendant challenges Counts 5 and 7, which are based on the filing of

Montefusco's local government ethics disclosure forms, as counts of honest services fraud. As noted above, both the initial and Superseding Indictment charged Mosberg with these counts. At that time, it was believed that such counts could proceed under a duty to disclose a conflict-of-interest theory of honest services fraud.

Skilling barred the government from proceeding under the conflict-of-interest theory of honest services fraud. Following Skilling, the Government here returned to the grand jury, and the grand jury returned the instant Indictment, the Second Superceding Indictment, which (again) contains counts regarding the mailings related to the local government ethics disclosure forms.

In light of these counts' inclusion in the earlier, pre-Skilling indictments as bases for a conflict of interest theory of honest services fraud, Mosberg is skeptical of the Government's recasting of these same counts as now being in furtherance of a bribery theory, and whether the grand jury was adequately informed of the governing law. I separately address below whether I will conduct an in camera review of the grand jury proceedings to confirm whether the grand jury was properly instructed in connection with its return of the current Indictment on those counts.

In this section of the opinion, however, I address whether the mailing of local government ethics forms may serve as the basis for an honest services fraud count under a bribery theory in the post-Skilling context. I, further, address Mosberg's argument that the Indictment fails to allege knowledge, and that the forms could not have furthered the bribery scheme. For the reasons that follow, I reject each of Mosberg's arguments.

1.    The <u>Skilling</u> Effect

As noted, Mosberg challenges Counts 5 and 7 of the Indictment as an impermissible, "back-door" attempt by the Government to charge Mosberg with a failure to disclose (or conflict-of-interest) theory of honest services fraud. In response, the Government points to cases holding that evidence of concealment may support an honest services mail fraud count, even in the post-<u>Skilling</u> context. Focusing on whether the local government ethics forms may be admitted as evidence, however, is not the proper inquiry. That local government ethics forms may be admitted as evidence of a bribery scheme does not mean that the forms themselves can be the basis of a substantive honest services fraud count. To that question, I now turn.

The Supreme Court explained almost one hundred years ago in <u>Badders v. United States</u>, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916), that so long as each act "ha[d] been found to have been done for the purpose of executing the scheme, .... there is no doubt that the law may make each putting of a letter into the postoffice a separate offence." <u>Id.</u> at 394. Moreover, the Supreme Court has held that a mailing designed to conceal a scheme to defraud is in furtherance of that scheme and, therefore, that such a mailing may be charged as a distinct mail fraud count. In <u>United States v. Lane</u>, 474 U.S. 438, 451–52, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), a unanimous Supreme Court explained that mailings help execute a scheme to defraud if they are "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants

less likely than if no mailings had taken place." Id. at 451-52.[10] See also United States

v. Coyle, 63 F.3d 1239 (3d Cir. 1995) (quoting United States v. Otto, 742 F.2d 104, 108

(3d Cir. 1984)) (quoting same).  According to the Third Circuit, it is a "self-evident

proposition that the aim of virtually all criminal actors, including those who commit

mail fraud, is not only to accomplish their criminal goals, but also to escape detection

and liability for these misdeeds."  U.S. v. Hoffman, 229 Fed.Appx. 157, 158 (3d Cir.

2007).

In a case involving strikingly similar facts to those alleged here, the court in

United States v. Kerik, supra, denied a defendant-public official's motion to dismiss

honest services mail fraud charges against him.  The indictment in that case alleged

that the defendant had accepted bribery payments from a private company in exchange

for his assistance in helping that company obtain a New York City sanitation permit.

The challenged honest services fraud count was based on a mailing of a form by the

company.  The form included a question asking whether the company had  "given, or

offered to give, money or any other benefit to a public servant with the intent to

influence that public servant with respect to any of his or her official acts, duties or

decisions" within the last 10 years.  Id. at 269.  The company checked "no" in response

to that question, and submitted the form to the Department of Sanitation ("DOS") in

support of its permit application.  Id.

---

[10]    While there are two concurrences and dissents in part addressing a
separate issue in the opinion, each justice made clear that he joined in this aspect of
the majority's ruling.  See id. at 453 (Brennan, J. and Blackmun, J.); id. at 479
(Stevens, J. and Marshall, J.).

The Kerik court held that the fraudulent form could form the basis for an honest services mail fraud charge against the public official, Kerik. The court reasoned:

> It does not strain credulity—and a reasonable juror could find—that the letter constitutes a part of the scheme to deprive New York citizens of Kerik's honest services and was a conscious attempt to prevent the DOS from uncovering the alleged scheme.

Id. at 269. Thus, the court held, dismissal of that count was not warranted. See id. at 269-70. See also Hoffman, 229 Fed.Appx. at 158 (holding, in an honest services fraud case, that "mailings made to conceal either the existence or the true nature of a criminal scheme fall within the ambit of federal prohibitions against mail fraud.").

As Kerik demonstrates, fraudulent mailings designed to conceal a bribery scheme may be charged as substantive mail fraud counts. Like the mailings in Kerik, Montefusco's mailing of the fraudulent disclosure forms could have furthered the scheme to defraud by making it less likely that the Township would discover the alleged bribe payments. As noted, the Indictment alleges that Mosberg and Montefusco engaged in a quid pro quo bribery scheme. The Indictment explicitly alleges that the disclosure forms were used "for the purpose of executing and attempting to execute this scheme and artifice to defraud ...." Indictment, Counts 2-7, ¶ 4. Moreover, the Indictment adds that Montefusco failed to disclose the bribery scheme proceeds or benefits on the ethics disclosure forms:

> [t]o further conceal MOSBERG's and his conduct, the Attorney did not disclose material information, namely, his receipt of monies and other benefits . . . as a source of income on annual Local Government Ethics Law Financial Disclosure Statements, which were ultimately filed via U.S.

> Mail with the New Jersey Department of Community
> Affairs in Trenton, New Jersey.

Id., Count 1 at ¶ 9. Accordingly, the Indictment sufficiently alleges that the forms were mailed in furtherance of the bribery scheme.

Mosberg further argues that the forms could not have furthered the bribery scheme because "Counts 5 and 7 do not relate to, or in any way facilitate, the bribery scheme." Def. Reply at 31. However, as <u>Kerik</u> illustrates, a fraudulent disclosure form may further a bribery scheme if it prevents the local government body from uncovering the bribes. 615 F.Supp.2d at 269.

Finally, while Mosberg argues that <u>Skilling</u> precludes all honest services fraud counts based on the mailing of an ethics disclosure form, that broad reading does not hold where, as here, the Indictment expressly alleges that Montefusco failed to disclose the benefits he received from the bribery scheme, and the concealment of his receipt of these benefits <u>furthered the bribery scheme by hindering its detection</u>—not that he failed to disclose a conflict of interest. <u>Skilling</u> clearly prohibited only the latter. <u>See</u> 130 S.Ct. at 2931-32.

### 2. Knowledge

Because the Indictment does not allege that Mosberg knew that Montefusco mailed the forms, Mosberg argues that he cannot be charged with counts based on the mailing of the local government ethics forms. Such knowledge need not be pled, however. <u>U.S. v. Vella</u>, 414 Fed.Appx. 400, 408 (3d Cir. 2011) ("the prosecution [is] not obligated to show that [the defendant] planned a mailing or even knew that mailings

would occur ....").  See also United States v. Tiller, 302 F.3d 98 (3d Cir. 2002).  All that

is required is that Mosberg knowingly "caused" the mailing to occur, i.e., that Mosberg

performed "an act with knowledge that the use of the mails [would] follow in the

ordinary course of business, or where such use [could] reasonably be foreseen, even

though not actually intended."  United States v. Desarro, 225 Fed.Appx. 53, 56 (3d Cir.

2007) (quoting Tiller, 302 F.3d at 101).  While the Indictment does not explicitly allege

that Mosberg knew of the Attorney's disclosure requirements, whether the mailing was

reasonably foreseeable is a fact to be proven at trial.  Cf. id. (reasoning that jury may

infer that a defendant directed a letter to be mailed, or that a mailing was reasonably

foreseeable).[11]    In any event, Mosberg is also charged with aiding and abetting

Montefusco's mailing of the local government ethics forms.  Therefore, Defendant's

motion to dismiss Counts 5 and 7 for failure to allege knowledge is denied.

### 3.    The Parr Doctrine

Lastly, Mosberg argues that the ethics forms counts should be excluded under

the  Parr doctrine, which stems from the Supreme Court's decision in United States v.

Parr, 363 U.S. 370 (1960).  Mosberg argues that Parr holds that any mailing required

by law cannot form the basis for a mail fraud count.  In his view, the mailing of the

local government ethics forms could not have furthered the bribery scheme because

Montefusco was required by law to mail the forms.

---

[11]    In this connection, the Indictment alleges that Mosberg told Montefusco
to keep their arrangement secret.  See Indictment, Count 1, ¶ 6c ("MOSBERG told the
Attorney, in substance and in part, that no one should know about this and encouraged
the Attorney to conceal material information, by not disclosing their arrangement.").

Contrary to Mosberg's argument, the basis for Parr's ruling was not simply that the mailing in that case was required by law; the Court found it critical that the mailing itself was not intrinsically false. Parr involved a scheme to defraud by members of a school board who converted the school district's tax receipts to their own personal use. At issue in Parr were school tax assessment forms mailed by the local school board to the school district for record keeping purposes. Id. at 385. The Court held that the mailings were not an unlawful step in the plot to defraud, part of the execution of the fraud, or made for the purpose of executing the fraudulent scheme, because the mailings were legally required and not "padded or in any way unlawful." Id. at 391.[12]

The Court made clear that its holding was not based solely on the fact that the mailings were legally required. It stated its holding as follows:

> in the light of the particular circumstances of this case, and especially of the facts (1) that the School Board was legally required to assess and collect taxes, [and] (2) that *the indictment did not charge nor the proofs show that the taxes assessed and collected were in excess of the District's needs or that they were 'padded' or in any way unlawful*, . . . it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute.

Id. at 391.

Moreover, Parr implicitly acknowledged that a falsified tax assessment form

---

[12] Indeed, the court narrowly defined the question at issue as "whether the legally compelled mailings of the lawful-or, more properly, what are not charged or shown to have been unlawful- [mailings], properly may be said to have been for the purpose of executing a scheme to defraud ...." Id. at 389.

could have constituted an essential step in executing the scheme to defraud in that case.  Id. at 386 (noting Plaintiff's concession to that effect).  Several courts have since interpreted Parr in this manner, limiting its holding to non-fraudulent mailings.  See e.g., United States v. Tarnopol, 561 F.2d 466, 472 (3d Cir. 1977) overruled on other grounds by Griffin v. United States, 502 U.S. 46, 56-57, 112 S. Ct. 466, 473, 116 L. Ed. 2d 371 (1991) (holding that "routine mailings required by law *which are themselves intrinsically innocent* even though they take place during the course of carrying out a fraudulent scheme" may not support a mail fraud prosecution) (emphasis added) quoted in United States v. Cross, 128 F.3d 145, 150 (3d Cir. 1997).  See also U.S. v. Wittig, 575 F.3d 1085, 1093 (10th Cir. 2009) ("[U]nder the rule in Parr v. United States,[mailings] cannot be for the purpose of executing a fraud when they are made only in response to an 'imperative command of duty imposed by ... law,' *unless they are also false or fraudulent.*") (emphasis added) (internal citation omitted); United States v. Curry, 681 F.2d 406, 412 (5th Cir. 1982) ("[M]ailings of documents which are required by law to be mailed, and which are not themselves false and fraudulent, cannot be regarded as mailed for the purpose of executing a fraudulent scheme.").  Because the Indictment here alleges that the local government ethics forms were fraudulent, they do not fall under Parr's proscription.  Accordingly, for the reasons stated above, Defendant's motion to dismiss Counts 5 and 7 of the Indictment is denied.

### D.     Conspiracy to Commit Honest Services Fraud

In Count 1, the Government alleges that, pursuant to 18 U.S.C. § 1349,

Mosberg conspired to commit honest services fraud through a bribery scheme. Mosberg's primary argument is that the conspiracy count is invalid because it fails to allege an agreement. Much of my analysis regarding implicit quid pro quo agreements, supra, applies to Mosberg's challenge to the conspiracy charge for lack of alleging a conspiratorial agreement. Nevertheless, I address the specific arguments he makes with respect to conspiratorial agreements, and other issues, herein.

### 1. Section 1349 as a Substantive Offense

As an initial matter, Mosberg argues that 18 U.S.C. § 1349 does not create a substantive offense. Section 1349 provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Id. In Mosberg's view, this statutory provision is merely a sentencing enhancement because it cannot "stand alone" and must be linked to an underlying offense. Mosberg appears to argue that a conspiracy charge must be asserted under the general federal conspiracy statute, 18 U.S.C. § 371, instead.

Mosberg provides no legal authority in support of his arguments. Indeed, he acknowledges that the only authority addressing whether section 1349 creates a substantive offense, the unpublished decision in United States v. Tepoel, No. 07-cr-66-bbc, 2008 WL 4554926 (W.D.Wis. Feb. 27, 2008), reaches the opposite conclusion. More importantly, Supreme Court precedent interpreting a similarly worded provision in an analogous conspiracy statute undermines Mosberg's challenges to section 1349.

In Whitfield v. U.S., 543 U.S. 209 (2005), the Court held that a similarly-worded statute was not a penalty enhancement. The Court in Whitfield analyzed 18 U.S.C. § 1956(h), which states that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." First, the Court noted that the language of section 1957 is similar to other conspiracy statutes, such as the drug conspiracy statute found at 21 U.S.C. § 846,[13] that "indisputably" create substantive offenses. Whitfield, 543 U.S. at 215. In addition, the Court reasoned, there is no express reference to § 371 that would suggest Congress intended to rely on that statute in lieu of § 1956(h) as the basis for a conspiracy charge. That section 1956(h) was enacted under the title "*Penalty* for Money Laundering Conspiracies" did not alter the Court's analysis. Id. at 216 (emphasis in original). In addition, the Court rejected the defendant's statutory structure argument that "[h]ad the drafters intended § 1956(h) to create a new offense . . . they would have placed it with the offenses in subsection (a) instead of in its own separate subsection." Id. at 217 ("We find nothing remarkable in Congress' decision to place a qualitatively different conspiracy offense provision in a separate subsection.").

Mosberg's arguments with respect to section 1349 mirror those rejected by the Court in Whitfield. Like the defendant in Whitfield, Mosberg makes much of the fact that the title of the law enacting section 1349 includes the term "penalty." See Def.

---

[13]     "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

Open. Br. at 28. (quoting Title IX of the Sarbanes-Oxley Act of 2002, "White-Collar Crime Penalty Enhancements"). Also like the defendant in Whitfield, Mosberg argues that Congress would have denoted section 1349 as a subsection of § 1341, *e.g.,* as § 1341(a), if it meant for § 1349 to constitute a substantive offense. The Court squarely rejected this type of argument in Whitfield, "find[ing] nothing remarkable in Congress' decision to place a qualitatively different conspiracy offense provision in a separate subsection." 543 U.S. at 217. Applying Whitfield's reasoning here, I conclude that section 1349 creates a substantive offense and is not merely a sentencing enhancement. Cf. United States v. Berger, No. 09-308, 2010 WL 4237925, *5 (W.D.Pa. 2010) ("The rationale of Whitfield is controlling here because 18 U.S.C. § 1349 contains similar language to that considered in Whitfield by the Supreme Court.").

Mosberg argues, in his supplemental briefing, that Whitfield is not persuasive because the Third Circuit does not interpret section 1956(h), the statute at issue in Whitfield, in the same fashion as section 1349. Specifically, Mosberg argues that, in a nonprecedential decision, U.S. v. Reed, 350 Fed.Appx. 675 (3d Cir. 2009), the Third Circuit held that section 1349 requires an overt act in furtherance of the conspiracy. According to Mosberg, because section 1956(h) does not require an overt act, the two statutes should not be interpreted analogously.

I disagree. For one, Reed does not explicitly hold that section 1349 requires proof of an overt act. The opinion assumes, without deciding, that such an act is required. See 350 Fed.Appx. at 678 (including overt act in description of elements of conspiracy to commit bank fraud in violation of section 1349). Since Reed, at least one

district court in this district has held that section 1349 does not require proof of an overt act.  U.S. v. Berger, No. 09-308, 2010 WL 4237925 (W.D.Pa. Oct. 21, 2010). That court reasoned that the plain text of section 1349, like section 1956(h) at issue in Whitfield, omits any express overt-act requirement.  Id. at *4.

Whether or not section 1349 includes an overt act requirement, I cannot discern from Mosberg's limited argument on this point (totaling two paragraphs in his supplemental briefing), why the existence of an overt act requirement would make section 1349 a penalty enhancement as opposed to a substantive crime.  Even if the Third Circuit construes section 1349 differently than 1956(h), that does not undercut the bulk of the Supreme Court's analysis as to whether section 1956(h) is a penalty enhancement or substantive crime.  Whitfield focuses its analysis on the statutory scheme and wording of that statute.  Accordingly, I am not persuaded by Mosberg's citation to Reed.[14]

## 2.    Conspiratorial Agreement

_____

[14]    My decision is not affected by the Third Circuit's recent decision in U.S. v. Lewis, --- F.3d ----, 2011 WL 4925869 (3d Cir. 2011), which held that 18 U.S.C. § 3147 does not create a substantive offense.  That statute differs in substance and form from section 1349.  Section 3147, which applies to crimes committed during a defendant's pretrial release, provides that "[a] person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to . . . a term of imprisonment of not more than ten years if the offense is a felony ...."  In contrast, section 1349 provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense ...."  These substantive differences render Lewis not relevant to my decision.

Mosberg is correct that, to adequately allege a conspiracy, the government must assert "that the alleged conspirators shared a unity of purpose, the intent to achieve a common goal, and an agreement to work together toward the goal." United States v. Holmes, 387 Fed. App'x. 242, 245 (3d Cir. 2010) (quoting United States v. Reyeros, 537 F.3d 270, 277 (3d Cir. 2008)). Since conspiratorial agreements are rarely manifest,

> [t]he existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference [ ] that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding.

Id. at 242 (quoting United States v. Brodie, 403 F.3d 123, 133) (3d Cir. 2005)).

The Indictment generally alleges that Mosberg "did combine, conspire, confederate and agree with the attorney to use the United States mail for the purpose of executing a scheme and artifice to defraud the Planning Board, the Township and its citizens of the right to the attorney's honest services." Count 1, ¶ 3. Further, the Indictment alleges that Mosberg gave "the Attorney and his family members a stream of concealed bribes and otherwise corrupt personal benefits," id., ¶ 4, and that "in exchange for these benefits and in connection with their mutual beneficial relationship," the Attorney used his position as Planning Board attorney and Township attorney to help Mosberg in his dealings with those bodies. Id.,¶ 10. Based on these facts, the Indictment alleges that Mosberg and the Attorney entered into a conspiratorial agreement in 1997, which lasted through 2007.

In Mosberg's view, the Indictment is infirm because it fails to identify any actual

agreement between Mosberg and the Attorney entered into in 1997, or any facts supporting such an assertion. Mosberg relies heavily on language in <u>U.S. v. Panarella</u>, 277 F.3d 678 (3d Cir. 2002), that an indictment must allege facts to support a violation of a criminal statute; it is not enough to simply track the language of the statute. <u>Id.</u> at 680. He further points to language in <u>Brodie</u> that "[c]onspiracy cannot be proven 'by piling inference upon inference' where those inferences do not logically support the ultimate finding of guilt." 403 F.3d at 134. The Government counters, arguing that it has alleged an implicit agreement. Moreover, the Government points to the Third Circuit's recent decision in <u>Bergrin</u>, discussed <u>supra</u>, which reaffirmed the limited scope of a motion to dismiss under Rule 12(3)(b)(3).

Mosberg's reliance on <u>Panarella</u> is misplaced. <u>Panarella</u> considered whether a Rule 12(b)(2) challenge to a guilty plea could be sustained where the defendant argued that the specific facts alleged in the information did not amount to honest services wire fraud. 277 F.3d at 685. In that pre-<u>Skilling</u> case, the defendant pled guilty to honest services fraud based on both bribery-based allegations and concealment-based allegations. Concluding that the concealment allegations could support an honest services fraud charge, the <u>Panarella</u> court held that there were sufficient facts in the information to bring the defendant's conduct within the ambit of the statute.

As explained <u>supra</u>, <u>Bergrin</u> expressly noted that courts have misread <u>Panarella</u>, and relied upon it to inquire into the Government proofs at the motion to dismiss the indictment stage. 650 F.3d 257 at *9. According to <u>Bergrin</u>, <u>Panarella</u> merely held that courts should "determine whether 'the specific facts alleged in the charging

47

document fall beyond the scope of the relevant criminal statute, *as a matter of statutory interpretation*."  Id. (quoting Panarella, 277 F.3d at 685) (emphasis in original).  The question in Panarella was not whether the information alleged adequate specific facts in support of a general allegation of concealment.

Bergrin further defines the proper inquiry by reference to decisions where the facts alleged did not state an offense under a given criminal statute.  For example, Bergrin cites United States v. Schiff, 602 F.3d 152, 162–66 (3d Cir. 2010), where it was held that an "indictment alleging 'failure to rectify misstatements of others' does not, as a matter of law, state an offense under a securities statute that criminalizes omissions of information."  Bergrin, 650 F.3d at 265.  A second example was Gov't of V.I v. Greenidge, 600 F.2d 437, 438-40 (3d Cir. 1979), where the court held that an "indictment alleging assault on male companion of a rape victim does not, as a matter of law, state an offense under statute that criminalizes assaulting a rape victim." Bergrin, 650 F.3d at 265.  As these examples illustrate, the inquiry on a challenge to a statute's scope is whether the alleged conduct could ever be alleged in such a fashion so as to fall within the statute's ambit; in those examples, the alleged conduct could not.

Hence, contrary to Mosberg's argument, an indictment need not allege facts to provide evidentiary support for a violation of a criminal statute.  Rather, the Indictment may simply track the language of the statute while providing sufficient factual orientation to the defendant for double jeopardy purposes.  Vitillo, 490 F.3d at 321.  It may well be that the government cannot prove the existence of an agreement

at trial.  As long as the indictment expressly alleges that an agreement of some form existed, and there is factual orientation to apprise the defendant of the charges against him, that is sufficient under Bergrin.

Under this standard, I conclude that the Indictment sufficiently alleges a conspiratorial agreement.  The Indictment includes an express allegation of the 1998 Mazdabrook agreement and 2006 "six-figure bribe" payment agreement, includes allegations describing how the scheme allegedly worked, and specifies the time frame of the bribery scheme.  See Indictment, Count 1, ¶ 10.

For the sake of completeness, I note the Government's argument that one can infer a conspiratorial agreement based on the size of the alleged benefits.  The government cites the 11th Circuit case of United States v. US Infrastructure, Inc., 576 F.3d 1195 (11th Cir. 2009), for this proposition.  In that case, the Eleventh Circuit upheld an honest services fraud conviction against private individuals for bribing Jefferson County officials.  The bribes consisted of thousands of dollars in cash and gift cards to county officials.  Id. at 1206-07.  The court held that "the nature and size of the[se] gifts" served as evidence that the gifts were given with intent to influence.  Id. at 1207.  US Infrastructure is factually distinguishable, however, because the facts alleged here involved transactions that were primarily directed at a third-party with only a portion of those funds ($36,000) being transferred to the Attorney.  Indictment, Count 1, ¶ 8.  Therefore, I choose not to rely upon US Infrastructure as persuasive authority here.

As an additional matter, Mosberg argues that the Government previously

conceded that no agreement was reached in connection with the conspiracy. Mosberg quotes a comment the Government made at the January 2009 hearing on his motion for a bill of particulars. What the Government stated is that "there was no specific instance where the parties sat down and said: Okay this is what we are going to do; we are going to agree to have this conspiracy. It formed, it began with a close relationship and it developed into a criminal conspiracy." Transcript at page 18, lines 17-22 (emphasis added). Despite Mosberg's characterization to the contrary, the Government did not concede there was no agreement; the Government stated that the indictment (in effect at that time) did not plead a specific date upon which the agreement was reached.

Accordingly, for the foregoing reasons, Mosberg's motion to dismiss Count 1 is denied.

### E.    Bribery Affecting Federal Funds - Counts 8 -11 (18 U.S.C. § 666)

In the Indictment, the section 666 bribery allegations replicate the honest services fraud allegations. Counts 8, 9, and 11 incorporate three of the favorable real estate deals, and Count 10 incorporates the 2006 "six-figure" payment allegation. The only additional allegation pled in the section 666 counts is that "the Township received in excess of $10,000 in federal assistance" during 2004, 2005, and 2006. Counts 8-11, ¶ 2.

Apart from these allegations, the indictment's language tracks the bribery affecting federal funds statute, 18 U.S.C. § 666(a)(2), which provides that

    Whoever . . . corruptly gives, offers, or agrees to give

50

anything of value to any person, with intent to influence or reward an agent of . . . a . . . local . . . government, or any agency thereof, in connection with any business, transaction, or series of transactions of such . . . government, or agency involving anything of value of $5,000 or more shall be fined ...."

Id..

Mosberg first argues that, as with the honest services fraud counts, the section 666 counts do not sufficiently allege quid pro quo bribery. Second, Mosberg argues that section 666 does not reach Mosberg's conduct because Montefusco was not an agent of the Township. Finally, Mosberg argues that Montefusco did not have the authority to affect federal funds and his alleged conduct did not occur in connection with Township business. I address each of Mosberg's arguments in turn.

## 1. Section 666 Quid Pro Quo Requirement

The Third Circuit has declined to rule on whether section 666 requires proof of a quid pro quo bribery. In my decision in United States v. Bryant, 556 F.Supp.2d 378 (D.N.J. 2008), I held that the section 666 allegations in that case sufficiently alleged a quid pro quo arrangement. Id. at 424. Ultimately, the defendants in Bryant were convicted of section 666 counts and they appealed that conviction to the Third Circuit. In its opinion affirming the convictions, the Third Circuit refrained from addressing the United States' argument that section 666 counts do not require proof of a quid pro quo, noting that "[b]ecause we believe that the instruction [below] did require the jury to find an exchange, we need not decide that question today." Bryant, 2011 WL 3715811 at *7 n. 16.

Thereafter, in a non-precedential decision following <u>Bryant</u>, the Third Circuit explained:

> There is an earnest circuit split on whether § 666 does or does not require proof of a *quid pro quo*. There is no Supreme Court or Third Circuit precedent on the point. Neither the Supreme Court nor any Court of Appeals has ... require[d] proof of an explicit *quid pro quo* for a conviction under § 666.

<u>Beldini</u>, 2011 WL 3890964 at *8. Based on this lack of direct authority, the court in <u>Beldini</u> held that there was no plain error in a district court's decision not to instruct a jury that a <u>quid</u> <u>pro</u> <u>quo</u> was required under section 666.

In my view, the courts that have imposed a <u>quid</u> <u>pro</u> <u>quo</u> requirement have the better side of the argument. Nonetheless, whether or not a section 666 count must include <u>quid</u> <u>pro</u> <u>quo</u> allegations, my analysis of the <u>quid</u> <u>pro</u> <u>quo</u> bribery theory in connection with the honest services fraud counts in this case applies with equal force to the section 666 counts. Cf. <u>Bryant</u>, 2011 WL 3715811 at *7 n.11 ("Inasmuch as we believe the evidence was sufficient with respect to the *quid pro quo* alleged in the honest services fraud counts, we also conclude it was sufficient to support the bribery counts, as the bribery counts were based on the bribery alleged in the honest services fraud counts.").[15] For this reason alone, Mosberg's motion to dismiss Count 8 through 11 for failure to allege a <u>quid</u> <u>pro</u> <u>quo</u> arrangement may be denied. In the interest of

---

[15] While, as noted, Bryant addressed the sufficiency of the evidence at trial, rather than the adequacy of the allegations plead in the indictment, the general principle remains that an adequately plead quid pro quo arrangement in the honest services counts, that is mirrored in the section 666 counts, would be similarly sufficient.

completeness, however, I address Mosberg's section 666-specific <u>quid</u> <u>pro</u> <u>quo</u> arguments.

In addition to those arguments he also made in support of his honest services fraud challenges, Mosberg further argues that the indictment must plead a "but for" causal link as he contends I held in <u>U.S. v. Bryant</u>, 556 F.Supp.2d at 423. Mosberg reads <u>Bryant</u> too broadly. I did not hold that a "but for" causal link <u>must</u> be alleged; rather, I held that a "but for" causal link had been alleged and, thus, I did not have to decide whether it must be so plead. <u>See</u> <u>id.</u>[16] As noted <u>supra</u>, in <u>Bryant</u>, I held that language strikingly similar to that found in the instant Indictment sufficed to allege a <u>quid</u> <u>pro</u> <u>quo</u> arrangement. The indictment alleged that Bryant "did corruptly solicit ... a salaried and pensionable position at SOM ... intending to be influenced and rewarded in connection with" his role as a state legislator. <u>Id.</u> Likewise, here, the Indictment alleges that Mosberg "did corruptly give, offer to give, and agreed to give" real estate transaction proceeds to the Attorney "with the intent to influence and

---

[16]     The Court's exact words were:

> [it] does not need to reach the issue of whether "intending to be influenced or rewarded" within the meaning of § 666(a)(1)(B) requires that a defendant take actions he would otherwise not have taken. This is because Count 7 clearly alleges a "but for" causal link between the quid, the SOM salary, and the quo, Bryant's conduct in transactions involving the state of New Jersey: Bryant "did corruptly solicit ... a salaried and pensionable position at SOM ... intending to be influenced and rewarded in connection with...." Indictment, Count 7, ¶ 3 (emphasis added).

<u>Id.</u>

reward the Attorney in connection with a business, transaction, and series of transactions of the Township and the Planning Board ...." Counts 8-11, ¶ 3. Regardless of whether Bryant stands for the proposition that a "but for" causal link is required, the indictment here is akin to the indictment in that case and therefore sufficiently pleads a quid pro quo bribery arrangement.

Finally, Mosberg argues in his reply brief that the Indictment fails to plead specific, detailed factual allegations of the actions Montefusco took on Mosberg's behalf. As explained supra, Bergrin makes clear that indictments need not include such detailed factual allegations. It is enough that an indictment provides sufficient factual orientation to appraise the defendant of the nature of the charges against him. The Indictment does so here by alleging, for example, that Montefusco provided Mosberg with secret information about the Mazdabrook development, and by way of further example, by alleging that Montefusco endorsed development agreements between the Township and Mosberg that included favorable sewer-connection fee language which undermined the Township's litigation position against Mosberg. In addition, the Indictment alleges that Montefusco and Mosberg would "discuss and strategize regarding the course and disposition of pending legal disputes and, in some instances, [Montefusco] would disclose confidential information with respect to the Township's settlement position in such cases." Indictment, Count 1, ¶ 10a. Accordingly, the Court denies Mosberg's motion to dismiss Counts 8 through 11 for failure to allege a quid pro quo arrangement.

### 2. Whether Montefusco is an Agent under Section 666

Mosberg argues that, for the Attorney to be an "agent of a local government" under the bribery statute, he must be able to "control or affect" federal funds. Def. Mov. Br. at 31 n. 23. Both parties agree that the Third Circuit's opinion in United States v. Vitillo, 490 F.3d 314 (3d Cir. 2007) is controlling.

At issue in Vitillo was whether an engineer hired by an airport authority was an agent of that body under section 666. The engineer was not an employee of the authority. Rather, he (i.e., his company) was hired by the authority in lieu of the authority maintaining an in-house engineer. Relying on section 666's plain text, which defines agent as "a servant or employee, and a partner, director, officer, manager, [or] representative," the court concluded that the engineer served as a construction manager and, therefore, fell within the ambit of the statutory definition. Id. at 324. The Vitillo court, in reaching its conclusion, emphasized the breadth of the statutory definition. According to Vitillo, not only does the statute reference a broad range of personnel, from managers to employees or representatives, the statutory language explicitly indicates that it does not provide an exhaustive list. Id. at 323.

Applying Vitillo's rationale here, the Indictment's allegations are likewise aligned with the text of the statute. As Planning Board attorney, and at times as counsel for the Township, the Indictment alleges that he "represented" both the Planning Board and the Township in land-related litigation. See Count 1, ¶¶ e-f. With statutory text defining agent as "a servant or employee, and a partner, director, officer, manager, [or] representative," the Indictment clearly alleges that he is an agent by stating that he represents the Planning Board and Township. 18 U.S.C. § 666(d)(1).

55

Moreover, the Indictment describes Montefusco as a "Township official." Id. at ¶ 2. This designation further suggests that the Montefusco falls within the purview of an "employee" under section 666.

Nevertheless, Mosberg seeks to distinguish Vitillo on its facts, arguing that the "agent" in that case had more managerial responsibilities than Montefusco allegedly did as Planning Board counsel or Township counsel in the instant Indictment. According to Mosberg, the defendant-construction manager in Vitillo could affect federal funds because the defendant was responsible for coordinating and overseeing all work performed on the airport authority's projects, and controlled the awarding of contracts. Def. Reply at 22 (citing United States v. Vitillo, 2005 U.S.Dist. LEXIS 14571, * 19 (E.D.Pa. 2005) aff'd 490 F.3d 314 (3d Cir. 2007)).[17] Mosberg contrasts those responsibilities with Montefusco's alleged roles, contending that Montefusco is not an agent because he could not award contracts, approve development applications, or settle litigations.

Mosberg's argument is unconvincing. That Montefusco could not award contracts, approve development applications, or settle litigations simply means that he did not exercise the same type of authority as the construction manager in Vitillo. It does not mean that the Indictment fails to allege that he affected federal funds in a different way. In other words, construction managers and counsel may both affect a

---

[17]     I further note that the Third Circuit in Vitillo did not cite to, or rely upon, these asserted responsibilities in its opinion, as is evident from Mosberg's resort to the district court opinion in his briefing. Nonetheless, I address Mosberg's argument on the merits.

local governmental body's funds although they will not affect the funds in the same manner. Thus, the question is not whether Montefusco's roles mirror that of the defendant in Vitillo, but whether the Indictment's allegations meet the definition of agent under the statute.

The Indictment describes Montefusco's duties as Planning Board counsel as preparing reports and providing advice, representing the Planning Board in litigation and mediation, drafting resolutions, and attending meetings and interacting with the Township administration. See Indictment, Count 1, ¶ 1e. Similarly, the Indictment defines his role as the Township attorney as rendering advice to the Township regarding the settlement of disputes and representing the Township in litigation with Mosberg-related entities on certain occasions.[18] These activities have the ability to affect federal funds because Montefusco's advice could sway the Township's decision-

---

[18]    In this way, the Indictment evokes the New Jersey Attorney General Opinion's description of planning board and township counsel responsibilities. As noted, section 666 explicitly includes "manager" in its definition of agents. New Jersey Attorney General Opinion 91-0133 describes the advisory roles of planning board and township attorneys as managerial positions. 1991 WL 527647 at *2-3. The Opinion further reasons that "an attorney who advises a public body 'wields considerable power and influence by virtue of his ability and opportunity to interpret the law and advise on legal matters. The force of his influence is subtle and pervasive." Id. (quoting Lafayette v. Bd. of Chosen Freeholders, 208 N.J.Super. 468, 474 (App. Div. 1986)). The Indictment's allegations as to Montefusco's roles as Planning Board counsel and Township counsel, described above, are consistent with this description. This is not to say, however, that state law should define the scope of "agent" under section 666, a principle that Vitillo rejects. See 490 F.3d at 323 ("There is nothing in the statute to suggest that we should consult extrinsic sources, such as the Restatement of Agency, in attempting to further define "agent." To do so might result in the improper importation of extraneous language into the statutory text."). Rather, the Attorney General Opinion suggests that the Indictment's characterization of Montefusco's roles is consistent with the common understanding of those roles.

making process as to whether or not to settle litigation, for example. As both Planning Board counsel and Township counsel, he allegedly advised the Township of the legal merits of pending litigation. Indeed, the Indictment further alleges that Montefusco participated in settlement negotiations regarding the Township's sewer and water fee disputes with Mosberg. See id. at ¶ Count 1f. The Indictment further alleges that Montefusco was a member of the five-person mediation team "assembled to settle COAH-related litigation in which the Township claimed it was entitled to more than $1 million that MOSBERG . . . had refused to pay."[19] Id.

Moreover, Vitillo makes clear that an individual need not be empowered to disburse funds in order to affect funds. As Mosberg acknowledges, Vitillo quotes language from the dissent in United States v. Phillips, 219 F.3d 404 (5th Cir. 2000), stating that "the expansive statutory definition of 'agent' ... recognizes that an individual can affect agency funds despite a lack of power to authorize their direct disbursement." Vitillo, 490 F.3d at 323.[20] In context, the quote provides:

> [T]o broadly protect the integrity of federal funds given to an agency, § 666 applies to *any individual who represents the agency in any way*, *as representing or acting on behalf of an agency can affect its funds even if the action does not directly involve financial disbursement*

Phillips, 219 F.3d at 423 (emphasis added). The dissent's point was that any one who falls within the statutory definition will necessarily affect federal funds because one

---

[19]     COAH stands for the Council on Affordable Housing.

[20]     Vitillo quoted this language in support of its argument that "§ 666(d)(1) does not define an "agent" as someone who necessarily controls federal funds ...." Id.

who "represent[s] or act[s] on behalf of an agency can affect its funds ...." Id. This language provides further support for my conclusion that Montefusco need not be authorized to award contracts, approve development applications, or settle litigations in order to be an agent under section 666.

Lastly, Mosberg argues that section 666 does not reach every local government employee but only those employees that affect federal funds. While this may be true, that proposition does not alter my analysis, because, for the reasons explained above, the Indictment sufficiently alleges that Montefusco was an agent, who through his advice and actions, affected Township funds. Nothing more is required.

### 3. Whether Montefusco is Agent of the Township or Planning Board

Mosberg next argues that Montefusco, at best, is an agent of the Planning Board, but not the Township at large. This argument is unavailing. As an initial matter, and as explained in more detail below, the Township funds the Planning Board. Hence any federal monies received by the Township could trickle down to the Board, and any perceived dichotomy that Montefusco may be the agent of only one local government entity versus the other evaporates. Moreover, the definition of government agency, in section 666, encompasses subdivisions, departments and "board[s]" of larger agencies. 18 U.S.C. § 666(d)(2).[21] Finally, the Third Circuit Model

---

[21] "[T]he term 'government agency' means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program." Id.

Jury Instructions provide, that "[a]n employee of one agency within a larger government department is an agent of that larger department as well." Third Circuit Model Jury Instructions (Criminal), 6.18.666A1A-1 at 389. While these instructions do not carry the force of law, I consider the instructions persuasive authority supporting the notion that an agent of a subset of a larger government body is an agent of the larger body as well. Thus, I reject Mosberg's argument that Montefusco is not an agent of the Township as a matter of law.

In a related argument, Mosberg contends that the Attorney could not have been an agent of the Township because state law prohibits an attorney from simultaneously serving as both Planning Board counsel and Township counsel. That the Township was prohibited by law from appointing Montefusco to both roles simultaneously does not mean that, as a matter of fact, the Township did not so appoint him. Accordingly, whether or not he served in both roles is a question of fact that may not be resolved on a motion to dismiss an indictment. Therefore, I conclude that the Indictment sufficiently alleges that Montefusco is an agent of the Township under section 666.

### 4. In Connection with the Business of the Entity Receiving Federal Funds

Mosberg also relies on United States v. Whitfield, 590 F.3d 325 (5th Cir. 2009), for the related proposition that an agent's conduct must be completed "in connection with" Township business in order to fall within section 666's ambit. The state court judges in Whitfield were convicted of accepting campaign finance bribes in connection with their running for election and reelection to judicial office in Mississippi. The

government asserted that the judges were agents of the Mississippi Administrative Office of the Courts ("MAOC"), a Mississippi agency charged with "assisting in the efficient administration of the *nonjudicial* business of the courts of the state." Whitfield, 590 F.3d at 344 (alterations omitted) (emphasis added).

On appeal, the Fifth Circuit held that the judges' acceptances of bribes from a litigant were not taken "in connection with any business, transaction, or series of transactions of" the MAOC. Id. at 346 (emphasis added) ("insofar as [the judges] may have been agents of the [M]AOC, their role as such had nothing to do with their capacity as judicial decisionmakers.") (emphasis added). In this way, Whitfield narrowly focuses on the precise role being performed by the defendants such that "a person is an agent only in so far [sic] as the person performs functions involving agency funds." U.S. v. Beldini, No. 10-2858, 2011 WL 3890964, *9 (3d Cir. Sept. 6, 2011) (interpreting Whitfield's holding).

Assuming for the sake of argument that the Third Circuit would follow Whitfield,[22] the Indictment sufficiently alleges that Montefusco performed functions involving Township funds. As noted, Montefusco allegedly advised the Township regarding pending litigation, participated in settlement negotiations, and sat on the COAH mediation team "assembled to settle COAH-related litigation in which the Township claimed it was entitled to more than $1 million that MOSBERG . . . had refused to pay." Indictment, Count 1, ¶ 1f. Consistent with these allegations, a jury

---

[22]     In a recent non-precedential decision, the Third Circuit discussed Whitfield but did not make clear whether it would align itself with Whitfield's holding. See U.S. v. Beldini, No. 10-2858, 2011 WL 3890964, *9 (3d Cir. Sept. 6, 2011).

could reasonably conclude that the Township's funds would be affected by Montefusco's influence on the Township's decision to settle or continue pursuing litigation of both the aforesaid development and non-development related matters. Moreover, as the Third Circuit recently suggested in Beldini, that a person "lacks authority" over local funds does not mean that person cannot be an agent under section 666. 2011 WL 3890964 at *8.

Lastly, by relying on United States v. Zwick, 199 F.3d 672 (3d Cir. 1999), Mosberg further argues that the Indictment must allege that the federal funds were received "by the entity for which the defendant was acting as an agent." 199 F.3d at 688. In his view, that the Indictment alleges that the Township received federal funds is insufficient—the Indictment must allege that the Planning Board received those funds in connection with the allegations that Montefusco acted as an agent for the Planning Board. Without going into a detailed analysis of the viability of Zwick, it is clear that a portion of that decision was overruled by Sabri v. United States, 541 U.S. 600 (2004), which held that section 666 does not "require proof of connection with federal money as an element of the offense." Sabri, 541 U.S. at 605.

In rejecting the notion that a nexus between the federal funds and the agent's actions be proved, the Sabri Court explained:

> corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there.

Id. at 606.  Based on this rationale, Sabri suggests that the federal funds need not be directly received by the precise agency for which the defendant was acting as an agent, so long as that agency was funded by the agency which received the federal funds.

In other words, Sabri's fungibility language is broad enough to encompass subdivisions of an agency to which the agency's funding trickles.  Therefore, the Government is not required to specifically allege that the Planning Board received federal funding.  It is enough that the Indictment alleges that the Township received funding, and that the Planning Board is a subset of the Township.  Indeed, it appears, as set forth below, that the Planning Board receives its funding from the Township.  By reading the Indictment in this fashion, I am employing a common sense approach to its interpretation, as I must on a motion to dismiss.  See Hodge, 211 F.3d at 76.

Both New Jersey law and the Township's ordinances state that the Planning Board receives funding from the Township.  For example, Parsippany-Troy Hills Ordinance § 225-8b provides that the Planning Board attorney's salary is paid by Township funds.  Specifically, the ordinance provides that "[t]he Planning Board may fix the compensation of or agree upon the compensation or other remuneration to be paid to the [Planning Board] Attorney, such experts and staff.  Such amount, however, shall not exceed the amount *appropriated by the Township Council for the use of the Planning Board*." (emphasis added).  In addition, New Jersey's Municipal Land Use Law explicitly directs the Township to make provision for the Planning Board—"The governing body shall make provision in its budget and appropriate funds for the expenses of the planning board."  N.J.S.A. 40:55D-24.

My conclusion is further buttressed by my holding, supra, that the Indictment sufficiently alleges that the Attorney is an agent of the Township. Thus, even assuming that the Indictment must allege that the precise agency for which the Attorney worked received federal funds, the Indictment is sufficient in this regard. Because Montefusco is alleged to be an agent of the Township, the Indictment's allegation that it was the Township that received the federal funds falls into line with Zwick's requirement that the funds be received "by the entity for which the defendant was acting as an agent." 199 F.3d at 688. In addition, the Township's ordinances expressly direct the Planning Board to hire a Planning Board Attorney. Ordinance § 225-8a states that "[t]he Planning Board shall employ or contract for the service of a Planning Board Attorney other than the Municipal Attorney ...." By directing the hiring of a Planning Board Attorney, the Township's ordinance effectively classifies that attorney as an employee of the township.

Indeed, the Fifth Circuit reached a similar conclusion in U.S. v. Harris, 296 Fed.Appx. 402 (5th Cir. 2008). That case involved section 666 charges against a county official who worked for the circuit clerk's office. At trial, it was adduced that the circuit clerk did not receive federal funds—only the county at large received those funds. The court upheld the official's section 666 convictions because the official was also an agent of the county. Id. at 404.

Accordingly, I reject Mosberg's argument that the Indictment must be dismissed for failure to allege that the Planning Board received the federal funds. Mosberg's motion to dismiss the section 666 counts is denied.

### F. Aiding and Abetting Charges

Mosberg correctly argues that, with respect to the bribery affecting federal funds charges in Counts 8-11 of the Indictment, the aiding and abetting charges make no sense. Counts 8-11 are directly solely at Mosberg's own conduct and he cannot aid and abet his own bribery. Thus, these aiding and abetting charge are hereby dismissed. Mosberg does not assert any independent basis for dismissing the remaining aiding and abetting charges. Therefore, the remaining counts are not affected by this ruling.

### G. Count 2 - Mailing of Invoice from Third Party Contractor

Count 2 of the Indictment is based on the mailing by one of the contractors hired to perform bathroom upgrades on one of the properties sold to Montefusco's children. See Indictment, Counts 2-7, ¶ 4 (Count 2). According to the Indictment, the real estate contract for this particular property was entered into on June 20, 2003, and Mosberg provided the purchaser with $3,350 in free upgrades to the property. See id. (describing the property as ("Property #5"); id. at Count 1, ¶ 10c(ii). Mosberg argues that this count is too remote to the bribery scheme to have been in furtherance of the scheme, citing U.S. v. Tarnopol, 561 F.2d 466 (3d Cir. 1977) abrogated on other grounds by Griffin v. U.S., 502 U.S. 46 (1991).

Tarnopol involved a mail fraud scheme orchestrated by Defendants Tarnopol, Garris, Wiegan, and Shep. Id. at 467. Tarnopol was the president and controlling stockholder of two corporations, Brunswick Record Corporation ("Brunswick") and Dakar Records, Inc. ("Dakar"), that were engaged in the business of producing, marketing, and selling phonograph records. Brunswick and Dakar would provide

65

original recordings to Columbia Record Productions ("Columbia"), a record-pressing plant and distribution center, which would in turn press the records and ship them to Brunswick's and Dakar's customers. Brunswick and Dakar would place an order, on behalf of their customers, by telephone. When mailing the phonograph records, Columbia would send a copy of the packing slip to Brunswick and Dakar. These packing slips were the only written record of the true amount of records sold. As part of the 1974 "payola" scandal, when Columbia mailed Brunswick and Dakar copies of the packing slips, Tarnopol and his co-schemers would retain some of the copies and ensure that they were not transmitted to the bookkeeping department. In this way, the schemers made it appear that fewer records were sold, and they were able to divert payments to disc jockeys instead. Id.

The Tarnopol court concluded that the packing slips mailed by Columbia to Brunswick and Dakar were routine business documents that did not further the scheme to defraud. Harkening back to the Parr doctrine, the court reasoned:

> We do not believe that there is a valid distinction to be drawn between those routine mailings which are required by law and those routine mailings, themselves intrinsically innocent, which are regularly employed to carry out a necessary or convenient procedure of a legitimate business enterprise. In either case the mailings themselves are not sufficiently closely related to the fraudulent scheme to support a mail fraud prosecution even though securing the funds received through some of them is the object of the scheme to defraud ....

Id. at 472. In its view, Columbia's mailing of the packing slips would have continued whether or not the scheme to defraud existed. Id. Moreover, the court further

reasoned, Columbia's mailing of the packing slips to Brunswick and Dakar "was itself intrinsically devoid of any element of fraud and, indeed, it or its equivalent would appear to have been necessary in the conduct of legitimate business by Brunswick and Dakar with Columbia."  Id. at  472.

Mosberg cites Tarnopol for the proposition that "routing mailings, devoid of any element of fraud and necessary in the conduct of the third party's business, are not mailings covered by the mail fraud statute."  Def. Reply at 32.  First, Tarnopol is factually distinguishable from the Indictment here.  In Tarnopol, the alleged fraudulent scheme did not begin until after the packing slips were received by Tarnopol and his co-schemers.  Here, in contrast, the bribery scheme is alleged to have existed for several years prior to the sale of Property #5.

Moreover, and significantly, the Indictment alleges that the $3,350 in free upgrades procured through the invoice resulted in a greater profit to the Montefusco family member purchaser upon reselling that property.  And, the Indictment alleges that this profit in and of itself is a bribe payment made either directly to the purchaser, Montefusco's child, or that the bribe payment was ultimately transferred along with other real estate sale proceeds to Montefusco's bank account.  So, unlike the packing slips in Tarnopol, the invoice here was actually one of the means by which Mosberg transferred bribe monies to Montefusco.  In this way, the mailing was an essential part of the bribery scheme.

Indeed, the Third Circuit has made clear that an innocent, routine business mailing may serve as the basis for a mail fraud count if those mailings are derivative

of the fraudulent scheme. U.S. v. Al-Ame, 434 F.3d 614 (3d Cir. 2006). The Indictment here alleges that Mosberg directed the contractor to undertake the bathroom upgrade work as a means of transferring bribe monies; by hiring a contractor to complete the free bathroom upgrades, that $3,350 in value was allegedly transferred to the purchaser for Montefusco's benefit. Further, it was reasonably foreseeable to Mosberg that the contractor would invoice him for the free bathroom upgrade work, and that the contractor would use the mails to forward the invoice to him for payment.

I would reach a different conclusion if it were not alleged that the free upgrade was, effectively, a transfer of bribe monies. For example, if purchasers who were not part of the bribery scheme were also given this sort of free upgrade, then it would not necessarily follow that the invoice furthered the bribery scheme. For this reason, if the evidence adduced at trial shows that such free upgrades were customarily granted to all, or substantially all, purchasers of Mosberg's homes, then the invoice count may run afoul of the principles of Tarnapol and Parr, and it would be subject to dismissal. At this juncture, however, I must take as true the Indictment's allegation that the free upgrade was a means of transferring bribery monies by providing a fiscal benefit the Attorney's child would not have otherwise been offered, and ensuring that the child would receive a greater profit upon re-sale. Therefore, I conclude the Indictment sufficiently alleges that the invoice was derivative, and in furtherance, of the alleged Mosberg-Montefusco bribery scheme to defraud. Mosberg's motion to dismiss Count 2 of the Indictment is, accordingly, denied.

### H. Vagueness of Section 1346 Allegations

Mosberg argues that the indictment fails to put forth specific factual allegations that Montefusco took any favorable official action. As noted supra, Bergrin does not require the detailed allegations that Mosberg seeks. Moreover, this argument merely rehashes Mosberg's arguments that Montefusco's actions were not taken in connection with Township business. Thus, I reject Mosberg's vagueness challenge for the same reasons expressed above.

## I.     In Camera Review of Grand Jury Proceedings

Pursuant to Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure, a court may direct that matters occurring before a grand jury be disclosed "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury ...." While Rule 6 permits disclosure, "[t]here is a presumption of regularity in grand jury proceedings." U.S. v. Holzwanger, No. 10-0714, 2011 WL 1741920 at * 10 (D.N.J. May 4, 2011) (citing United States v. R. Enterprises, Inc., 498 U.S. 292, 300–301, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991)); United States v. Educational Development Network Corp., 884 F.2d 737, 740 (3d Cir. 1989). Thus, "[f]or a party to obtain information about the conduct of grand jury proceedings, that party must offer evidence of a 'substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." United States v. Budzanoski, 462 F.2d 443, 454 (3d Cir. 1972). In other words, a defendant seeking access to grand jury proceedings must show "a particularized need before the grand jury [proceedings] may be disclosed." United States v. Jackson, 363 Fed.Appx. 159, 162 (3d Cir. 2010).

Here, Mosberg has not demonstrated a particularized need justifying disclosure of the grand jury proceedings. Mosberg's challenges focus on the Indictment's: (1) recasting of Counts 5 and 7 as in furtherance of a bribery scheme; (2) allegation that Mosberg gave "bribes" to Montefusco "in exchange for" official actions, whereas the prior indictment alleged that he gave Montefusco a stream of benefits "to influence and reward" Montefusco; and (3) broadening of Montefusco's role, in comparison to prior indictments.

The Indictment's recasting of Counts 5 and 7 as in furtherance of the bribery scheme is legally permissible. As explained supra, mailings designed to conceal or delay the detection of a scheme may be asserted as separate counts in furtherance of that scheme. Thus, there is no basis for me to conclude that the Government engaged in any type of misconduct in presenting Counts 5 and 7 to the grand jury. Furthermore, the grand jury that returned the instant Indictment is not the same grand jury that returned the prior indictments, so there is no concern that the instant grand jury may have been confused by any prior instructions or evidence pre-Skilling.

Mosberg, next, argues that the instant Indictment greatly expanded Montefusco's role regarding his representation of the Township as opposed to the Planning Board. As Mosberg notes in his papers, I have previously expressed concern about what sort of information was presented to the grand jury with respect to Montefusco's role. At the April 2009 arraignment for the Superceding Indictment, Mosberg challenged the Government's use of the "at various times" language in that indictment to describe the instances in which Montefusco served as an attorney for the

Township.  Mosberg argued that the "at various times" language was so vague that he could not "defend against the charges."  April 7, 2009 Transcript, 12:23-25 - 13:1-12. In response, I noted:

> I do have questions about what the grand jury decided here and which roles, and if he was therefore acting in an official capacity at those times, Montefusco. . . . They need to know what the indictment is. What did the grand jury find?  Was it based on one piece of litigation, five pieces of litigation? Was it based upon Montefusco being Township attorney? Was it based upon him being planning board attorney? And that sort of fits in again to perhaps which piece of activity it is that you claim he exercised control over or his influence over.

Id. at 22:25 - 24:7.

Following the arraignment, Mosberg filed a motion for a bill of particulars. At the oral argument on that motion, on June 1, 2009, the Court directed the Government to identify each of the litigations involving Mosberg and designate for which litigations Montefusco represented the Township.  June 4, 2009 Transcript, 12:13-22.  The Government complied on June 16, 2009.  See Govt. Ltr. dated June 16, 2009 at 1.

Two years later, on June 10, 2011, at the oral argument on the instant motion to dismiss the Second Superceding Indictment, I expressed my concern that the Government still had not sufficiently elucidated Montefusco's dual role.  I asked the Government to further "break down" which roles Montefusco played with respect to each Mosberg-related litigation. On July 14, 2011, the Government submitted another letter largely rehashing the same information stated in the June 16, 2009 letter.

While the Government has not precisely defined Montefusco's role, it has

specified each litigation and settlement negotiation with which Montefusco was involved. As noted in my substantive analysis above, Montefusco's alleged service as either Planning Board counsel, Township counsel, or both, suffices to bring him within the ambit of section 666. All that is required, at this juncture, is for the Indictment to place Mosberg on notice of the charges against him so that he may properly defend himself. By alleging that Montefusco served in both counsel roles, and by specifying which matters were involved, the Indictment affords Mosberg that notice. Therefore, I do not find the Government's decision not to further "break down" Montefusco's roles a basis for conducting an in camera review of the grand jury proceeding.

Mosberg argues that the Government's failure to more fully clarify Montefusco's role "provides further cause for the Court to review the grand jury minutes, to ensure that such evidence was furnished to the grand jury and that the Government did not simply tell the grand jury to indict Mr. Mosberg based purely on its say-so." Def. Supp. Br. dated July 18, 2011 at 3-4. As noted above, however, "[t]here is a presumption of regularity in grand jury proceedings," U.S. v. Holzwanger, 2011 WL 1741920 at * 10, and a defendant's mere belief that the government presented insufficient evidence to the grand jury is not a basis for granting disclosure. United States v. Perez, 246 Fed.Appx. 140 (3d Cir. 2007) (quoting United States v. Williams, 504 U.S. 36, 54 (1992)) ("[A] complaint about the quality or adequacy of the evidence . . . cannot serve as the basis of dismissing a grand jury indictment.").

Finally, Mosberg focuses on changes in the language relating to the quid pro quo bribery allegations. While the Superceding Indictment stated that Mosberg gave

Montefusco a stream of benefits "to influence and reward" Montefusco, the Second Superceding Indictment now alleges that Mosberg gave "bribes" to Montefusco "in exchange for" official actions. In contrast to Mosberg's assignment of a nefarious motive to the Government, the Government argues that the change merely clarifies the prior indictments' allegations. As I ruled earlier in this Opinion, the instant Indictment's language sufficiently alleges a bribery-based honest services fraud scheme. Therefore, I see no reason to question the Government's assertion that this change in language is just a clarification. Further, as a general matter, return of a superceding indictment—which occurs frequently—that includes some language changes should not result in such a scrutinizing comparison of any differences that necessitates the extraordinary remedy of reviewing grand jury proceedings. Accordingly, I conclude that Mosberg has not articulated a particularized need justifying in camera review of the grand jury proceedings based on the "in exchange for" language, as well as the additional grounds rejected herein.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the indictment is granted with respect to the aiding and abetting charges relating to Counts 8 through 11 of the Second Superceding Indictment. All other aspects of Defendant's motion to dismiss are denied. Defendant's motion to inspect the grand jury proceedings is likewise denied.

Date: November 9, 2011

_/s/ Freda L. Wolfson_____
Freda L. Wolfson, U.S.D.J.